**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TENSTREET, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:18-CV-3633-JRS-TAB |
| v. | ) | |
| | ) | |
| DRIVERREACH, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DRIVERREACH'S BRIEF IN**
**SUPPORT OF ITS MOTION TO DISMISS**

## TABLE OF CONTENTS

I.     **BACKGROUND** .................................................................................... **1**

    A.  The Commercial Trucking Industry .................................................. 1

    B.  The Parties and Procedural History. ................................................. 2

    C.  The Asserted Patent. ........................................................................ 3

       1.  The '575 Patent's Written Description ................................... 3

       2.  The '575 Patent's Claims ....................................................... 7

II.    **LEGAL STANDARDS** .................................................................... **10**

    A.  Motion to Dismiss Under Rule 12(b)(6) ......................................... 10

    B.  Patent Eligibility Under Section 101 .............................................. 11

    C.  Rule 12(b)(6) Motions Based on Section 101 After *Berkheimer* .............................. 13

III.   **ARGUMENT** .................................................................................. **15**

    A.  Claim 1 is an Appropriate Representative Claim. ........................... 15

    B.  Claim 1 is Patent-Ineligible Under Section 101. ........................... 16

       1.  *Alice* Step One: Claim 1 of the '575 Patent is Directed to an Abstract Idea. ....... 16

       2.  *Alice* Step Two: Claim 1 Does Not Contain an "Inventive Concept" Sufficient to Transform the Abstract Idea into Patent-Eligible Subject Matter. ..................... 20

    C.  Claims 2-30 Are Also Patent-Ineligible Under Section 101 ...................................... 26

IV.    **CONCLUSION** ............................................................................... **35**

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)................................................................14

*Active Disposal, Inc. v. City of Darien*,
  635 F.3d 883 (7th Cir. 2011) ...............................................................10

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  573 U.S. 208 (2014)................................................................... passim

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)........................................................................10

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
  569 U.S. 576 (2013)............................................................................11

*Automated Tracking Sols., LLC v. Coca-Cola Co.*,
  723 F. App'x 989 (Fed. Cir. 2018) .........................................................13

*Bancorp Servs. LLC v. Sun Life Assurances Co. of Can.*,
  687 F.3d 1266 (Fed. Cir. 2012)..............................................................23

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)..................................................... passim

*Berkheimer v. HP Inc.*,
  890 F.3d 1369 (Fed. Cir. 2018)...............................................13, 20, 21

*Bilski v. Kappos*,
  561 U.S. 593 (2010)............................................................................26

*BSG Tech LLC v. Buyseasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018)..............................................................17

*Burnett v. Panasonic Corp.*,
  741 F. App'x. 777 (Fed. Cir. 2018) .......................................................14

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014)..............................................................22

*CardioNet, LLC v. InfoBionic, Inc.*,
  No. 17-CV-10445-IT, 2018 WL 5017913 (D. Mass. Oct. 16, 2018) ......................14

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
    316 F. Supp. 3d 1138 (N.D. Cal. 2018) ..........................................................................15, 18

*Consumer 2.0, Inc. v. Tenant Turner, Inc.*,
    No. 2:18CV355, 2018 WL 5668617 (E.D. Va. Nov. 1, 2018) ........................................ passim

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014)..............................................................................13, 16, 17, 30

*Coqui Techs., LLC v. Gyft, Inc.*,
    No. CV 17-777-CFC-SRF, 2018 WL 6033479 (D. Del. Nov. 16, 2018)..............................32

*Credit Acceptance Corp. v. Westlake Servs.*,
    859 F.3d 1044 (Fed. Cir. 2017)........................................................................................17

*Data Engine Techs. LLC v. Google LLC*,
    906 F.3d 999 (Fed. Cir. 2018).........................................................................................14

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)........................................................................................21

*Distefano Patent Trust III, LLC v. LinkedIn Corp.*,
    No. 17-1798-LPS-CJB, 2018 WL 4674571 (D. Del. Sept. 28, 2018) ...................................18

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016).........................................................................17, 20, 32, 33

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)...................................................................................17, 18

*Epic IP LLC v. Backblaze, Inc.*,
    No. CV 1:18-141-WCB, 2018 WL 6201582 (D. Del. Nov. 26, 2018)............................14, 24

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
    839 F.3d 1089 (Fed. Cir. 2016)..................................................................................... passim

*Finnavations LLC v. Payoneer, Inc.*,
    No. 1:18-CV-00444-RGA, 2018 WL 6168618 (D. Del. Nov. 26, 2018) .........................25, 33

*Gaelco S.A. v. Arachnid 360 LLC*,
    293 F. Supp. 3d 783 (N.D. Ill. 2017), *aff'd*, 742 F. App'x 512 (Fed. Cir. 2018) .............21, 28

*Genetic Techs., Ltd. v. Merial LLC*,
    818 F.3d 1369 (Fed. Cir. 2016)........................................................................................11

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)...........................................................................17, 18, 22, 28

iii

*In re Villena*,
No. 2017-2069, 2018 WL 4145863 (Fed. Cir. Aug. 29, 2018) ..............................................14

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015)................................................................13, 23, 28, 33

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016)................................................................20, 21, 24

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015)................................................................16

*Interval Licensing LLC v. AOL, Inc.*,
896 F.3d 1335 (Fed. Cir. 2018)................................................................17

*IQS US Inc. v. Calsoft Labs Inc.*,
No. 16 CV 7774, 2017 WL 3581162 (N.D. Ill. Aug. 18, 2017).............................................34

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012)................................................................ passim

*McCauley v. City of Chicago*,
671 F.3d 611 (7th Cir. 2011) ................................................................10

*Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*,
811 F.3d 1314 (Fed. Cir. 2016)................................................................28

*Motivation Innovations, LLC v. Petsmart, Inc.*,
156 F. Supp. 3d 558 (D. Del. 2016)................................................................29

*Neochloris, Inc. v. Emerson Process Mgmt. LLLP*,
140 F. Supp. 3d 763 (N.D. Ill. 2015) ................................................................18

*O2 Media, LLC v. Narrative Sci. Inc.*,
149 F. Supp. 3d 984 (N.D. Ill. 2016) ................................................................23, 29

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015)................................................................23, 24, 34

*Papst Licensing GmbH & Co. KG v. Xilinx Inc.*,
193 F. Supp. 3d 1069 (N.D. Cal. 2016) ................................................................32

*Pharmastem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007)................................................................13, 21

*RecogniCorp, LLC v. Nintendo Co.*,
855 F.3d 1322 (Fed. Cir. 2017)................................................................16, 20, 27

*Richards v. Mitcheff*,
   696 F.3d 635 (7th Cir. 2012) ...................................................................10

*SAP America, Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018)......................................................... passim

*Secure Cam, LLC v. Tend Insights, Inc.*,
   No. 5:18-CV-02750-EJD, 2018 WL 5982869 (N.D. Cal. Nov. 14, 2018).................14, 32, 33

*Secured Mail Sol's LLC v. Universal Wilde, Inc.*,
   873 F.3d 905 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 2000 (2018)............................ passim

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
   873 F.3d 1364 (Fed. Cir. 2017).............................................................17, 18

*Tangelo IP, LLC v. Tupperware Brands Corp.*,
   No. 18-CV-692-RGA, 2018 WL 6168083 (D. Del. Nov. 26, 2018) ...........................24

*Tech. Dev. & Licensing, LLC v. Comcast Corp.*,
   258 F. Supp. 3d 884 (N.D. Ill. 2017) ......................................................29

*Thunder Power New Energy Vehicle Dev. Co. v. Byton N. Amer. Corp.*,
   No. 18-CV-03115-JST, 2018 WL 5734616 (N.D. Cal. Oct. 31, 2018)...................14

*TriPlay, Inc. v. WhatsApp Inc.*,
   No. CV 13-1703-LPS-CJB, 2018 WL 1479027 (D. Del. Mar. 27, 2018) .............14

*Tucker v. City of Chicago*,
   907 F.3d 487 (7th Cir. 2018) ...................................................................2

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017)........................................................20, 28, 30

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014).............................................................11, 34

*Uniloc USA, Inc. v. HTC Am., Inc.*,
   No. C17-1558JLR, 2018 WL 3008870 (W.D. Wash. June 15, 2018) ....................14

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
   793 F.3d 1306 (Fed. Cir. 2015)........................................................21, 23, 34

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
   887 F.3d 1376 (Fed. Cir. 2018).............................................................14, 16

*Walker Digital, LLC v. Google, Inc.*,
   66 F. Supp. 3d 501 (D. Del. 2014)...........................................................32

**FEDERAL STATUTES**

35 U.S.C. § 101 ...........................................................................................................11

**RULES**

Fed. R. Evid. 201 ........................................................................................................2

**REGULATIONS**

49 CFR § 391.23 ............................................................................. passim

79 CFR § 74618 ......................................................................................3, 12

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant DriverReach, LLC ("DriverReach") respectfully moves the Court for an order dismissing Plaintiff Tenstreet, LLC's ("Tenstreet") Complaint and finding that the claims of the asserted patent are patent-ineligible under 35 U.S.C. § 101.

The asserted patent, U.S. Patent No. 8,145,575 (the "'575 Patent"),[1] attempts to monopolize an age-old practice of performing pre-employment background checks. More specifically, the '575 Patent claims the use of a generic computer network to implement the abstract idea of collecting and exchanging data about job applicants. This is precisely the type of abstract idea that the Supreme Court and Federal Circuit have found on numerous occasions to be ineligible for patent protection under Section 101, and nothing in the claims provides an inventive concept sufficient to transform the claimed abstract idea into a patentable invention. Accordingly, for the reasons set forth herein, the Court should grant this motion.

## I.      BACKGROUND

### A.      The Commercial Trucking Industry.

The '575 Patent relates to a computer-based method of conducting pre-employment screening activities and specifically describes such a method that relates to the federally-regulated commercial trucking industry. Federal regulations require extensive pre-employment screening before a commercial trucking company can hire new drivers. These regulations are enforced by the Federal Motor Carrier Safety Administration ("FMCSA"), which was established within the Department of Transportation in 2000 and was formerly part of the Federal Highway Administration. The regulations have been in place for decades, and are

---

[1] A copy of the '575 Patent was provided with the complaint in this matter; accordingly, all citations to the '575 Patent are to Dkt. No. 1-1.

1

codified, for example, at 49 CFR § 391.23.[2]  The '575 Patent attempts to patent a method for

complying with these mandatory federal regulations.

**B.     The Parties and Procedural History.**

The parties are competitors; they both offer employment-related products in the

commercial trucking industry.  DriverReach is a relatively new Indiana company, founded in

2015 and devoted to increasing safety and efficiency in the commercial trucking industry

through its products and services (which include the accused VOE Plus Platform).

Tenstreet was founded in 2006.  Like DriverReach, Tenstreet offers products and services

in the commercial trucking industry, including, for example, "employment verification" products

and services.  (*See, e.g.*, Dkt. 1, ¶ 1.)

Apparently threatened by a newer company entering the market, Tenstreet appears to be

using litigation as a tactic to thwart competition.[3]  This tactic is misplaced for a number of

reasons, including that the '575 Patent is not enforceable.[4]  It is exactly the type of patent that the

Supreme Court, the Federal Circuit, and district courts across the country have held is ineligible

for patent protection because it is an improper attempt to patent abstract ideas.  DriverReach

explained this very issue to Tenstreet in pre-suit correspondence between the parties (which was

vaguely alluded to in Tenstreet's Complaint (*see* Dkt. 1, ¶ 11)); however, Tenstreet never

---

[2] The Court may take judicial notice of the existence of these regulations in ruling on this motion
to dismiss.  *See* Fed. R. Evid. 201; *Tucker v. City of Chicago*, 907 F.3d 487, 489 n.1 (7th Cir.
2018); *Secured Mail Sol's LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017),
*cert. denied*, 138 S. Ct. 2000 (2018).

[3] This lawsuit is just one example of Tenstreet's unfortunate behavior; Tenstreet's employees
have made other attempts to improperly and unfairly interfere with DriverReach's business.
Those actions are the subject of a separate lawsuit DriverReach has filed against Tenstreet.  *See
DriverReach LLC v. Tenstreet, LLC* (N.D. Okla., filed Dec. 12, 2018).

[4] Tenstreet's claims are also meritless for other reasons, including because DriverReach's
accused product does not meet the limitations of the patent claims; however, those reasons are
outside the scope of the present motion to dismiss.

responded to DriverReach's letter that raised this issue and instead filed this lawsuit.

## C.     The Asserted Patent.

The '575 Patent is entitled "Peer to Peer Sharing of Job Applicant Information." ('575 Patent, Cover Page.)  The provisional application for the '575 Patent was filed in April 2007. (*Id.* at 1:6-7.)  A non-provisional application was filed in April 2008, claiming priority to the provisional application.  (*Id.*)  The '575 Patent eventually issued in March 2012.  (*Id.*, Cover Page.)[5]  It includes one independent claim (claim 1) and twenty-nine dependent claims (claims 2-30).  (*Id.* at 5:42-8:18.)

### 1.     The '575 Patent's Written Description

The '575 Patent describes a method for using a computer network to coordinate the collection and sharing of job applicant verification data, particularly within the commercial trucking industry.  (*See* '575 Patent at 1:11-14.)  As the '575 Patent explains, "Federal regulations require that carriers complete a thorough verification process before hiring a commercial driver."  (*Id.* at 1:18-19.)  An important component of the federally-regulated verification process, according to the patent, is "inquiring of all employers in the preceding three years."  (*Id.* at 1:20-21.)  Also, according to the '575 Patent, at the time of the patent application in 2007, this employment verification process was "accomplished by carriers through a mix of manual fax processes, incomplete commercial employment history databases, and phone calls," as well as "online requests."  (*Id.* at 1:21-24, 3:33-35.)  The patent alleges that these known

---

[5] This timing is important.  Because the '575 Patent was filed and prosecuted before the Supreme Court's landmark decisions in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012) and *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), it was never analyzed under the two-step test set forth in *Mayo*, *Alice* and subsequent cases—a test that is now required when prosecuting these types of patent applications.  *See* 79 CFR § 74618.  Indeed, it is that very two-step test that, respectfully, should result in this Court finding that the claims of the '575 Patent are invalid under Section 101.

verification processes had several drawbacks, including that they were "time consuming," "expensive," and data errors in the process could be difficult to remedy.  (*Id.* at 1:24-29.) Accordingly, the inventors purported to solve these problems by "combin[ing]" these "unique components of technology" in an effort to provide "a holistic approach to the entire process." (*Id.* at 1:32-35.)

The '575 Patent describes this purported solution as a method that allows users to continue to use the "unique components of technology" that existed before the patent, such as fax, telephone, and online requests, to obtain and provide information relating to the employment verification process, but also stores that data in a "computerized central exchange" that users can access through a conventional peer-to-peer network.  (*Id.* at 1:39-42, 1:48-54, 2:67-3:1, 3:22-26.)

Importantly, the patent does not purport to invent a new peer-to-peer computer network or make an advance in the technology of existing peer-to-peer networks.  (*See generally id.*)  The '575 Patent refers to the computer exchange as "exchange 16."  (*See, e.g.*, *id.* at 3:21-22.) Generally, the role of "exchange 16" is to "manage[] the complexity of routing request[s] through the proper channel to the appropriate provider," (*id.*), as well as "handl[ing] any follow-up needed" with the requester, provider, and applicant and "captur[ing] the returned verification information" for the requester (*id.* at 3:26-28.)  The specification describes the exchange in functional terms, explaining what its role is in the verification process.  However, it does not provide any detail regarding the type of computer exchange that actually accomplishes the verification steps.  Nor does it purport to describe any form of improvement to already existing computer networks.  In other words, exchange 16 is merely a computer that is used as a tool to accomplish employment verification tasks that were previously performed by humans. Exchange 16 is not described as providing any unconventional aspects of a new computer or

4

computer network or any improvements to existing computer networks.

In addition to job applicants, there are two types of users of the '575 Patent's method, "requesters" and "providers": (1) "Providers are former employers or schools in possession of the verification data of one or more job applicants" and (2) "[R]equesters are prospective employers seeking verification data about one or more applicants." (*Id.* at 1:43-45.) The "verification data" exchanged between "requesters" and "providers" is data about the job applicant—e.g., his or her status "during a certain period of time." (*Id.* at 1:46-47.)

An embodiment of the '575 Patent's method works as follows: a job applicant submits an application to a prospective employer. Because the prospective employer needs to verify certain data about the applicant, the prospective employer becomes a "requester" who contacts the central computer exchange in an effort to obtain verification of the job applicant's employment-related information. (*Id.* at 3:11-14.) The "provider" of the applicant's prior employment information is his or her prior employer, so the computer exchange routes the request to that company. (*Id.* at 3:21-22.) After the provider receives the request, the provider provides the requested information to the exchange, via fax, through the web, or from information in a database. (*Id.* at 3:22-25.) The completed verification is then routed back to the requester. (*Id.* at 3:28-29.) This method, according to the '575 Patent, allows "providers" to also act as "requesters," and vice versa. (*Id.* at 3:5-6.) The method allegedly "adds value" by "offering a single system for managing all of their employment verification process" so that the "individual participants do not have to manage it for themselves." (*Id.* at 2:64 – 3:10.) In other words, the computer exchange performs the duties of a human resources employee for the requester.

To explain this disclosed method in even simpler terms: (1) Company A receives a job application from an applicant; (2) Company A submits a request to a generic computerized

exchange to verify the applicant's employment history; (3) the exchange routes Company A's request to the applicant's former employer (Company B); (4) Company B provides the requested data about the applicant to the exchange; and (5) the exchange provides the information to Company A.  In other words, the disclosed method relies on a peer-to-peer computer network to accomplish a task that can be accomplished by a human by simply contacting the former employer—via fax, phone, email, or other known communication channels—and requesting data about the job applicant.  Indeed, as the specification expressly admits, this has been accomplished by humans for decades.  (*See, e.g.*, '575 Patent at 1:18-19 (referencing "Federal regulations [that] require that carriers complete a thorough verification process before hiring a commercial driver").)

The figures below help illustrate this abstract idea.  The first figure is a "macro-level flow diagram" of the network of the claimed invention from a prospective employer's point of view, as illustrated in Figure 1 of the '575 Patent:



FIG. 1

('575 Patent at Fig. 1; *see also id.* at 2:34-39 (describing Fig. 1).)  In contrast, the diagram below illustrates the known process for employment verification (i.e., as performed by humans in the 2007-2008 timeframe):



(*See also* '575 Patent at 1:20-24, 3:33-35 (describing the "current process" for employment history verification).)  Thus, as shown above, the difference between what is described as the invention of the '575 Patent and the age-old employment verification process boils down to the use of a generic computing device (the "exchange" in the claimed invention) versus a human (in the known process) as the central figure controlling the flow of data.

### 2.    The '575 Patent's Claims

As noted above, the '575 Patent includes 30 claims.  ('575 Patent at 5:42-8:18.)  Claim 1 is in independent form while claims 2–30 depend from claim 1, either directly or indirectly.

Claim 1 reads as follows (with reference letters added for ease of reference):

| TABLE 1: '575 Patent, Claim 1 | |
| --- | --- |
| **(a)** | 1.  A method for peer-to-peer sharing of job applicant verification data over a network, the network comprising; a computerized exchange being in communication with one or more requesters, providers, and job applicants; the exchange managing one or more interactions of each requester, provider, and job applicant with the exchange; each requester being an entity seeking verification data about one or more |

7

| | |
|---|---|
| | job applicants, each provider being an entity in possession of the verification data of one or more job applicants and providing the verification data in response to a request for the verification data, the verification data disclosing a status of the job applicant during a period of time; said method comprising the steps of: |
| **(b)** | allowing one or more communication channels to interface with the exchange; |
| **(c)** | assigning an attribute to each requester, provider, and job applicant, the attribute defining the communication channel accessible to each requester, provider, and job applicant in transmitting data to the exchange and receiving data from the exchange; |
| **(d)** | receiving a verification request from a requester through the communication channel of the requester; |
| **(e)** | comparing, by the computerized exchange, the verification request with requirements; |
| **(f)** | routing the verification request to a provider through the communication channel of the provider; |
| **(g)** | receiving verification data provided by the provider in response to the verification request through the communication channel of the provider; and |
| **(h)** | routing the received verification data through the communication channel of the requester; |
| **(i)** | wherein at least one requester is also a provider for a second requester and at least one provider is also a requester for a second provider, the at least one requester providing verification data to the exchange for a period of time in which a respective job applicant was employed by the at least one requester and the second provider providing verification data to the exchange for a period a time in which the same or a different respective job applicant was employed by the second provider. |

The dependent claims add steps and/or claim particular features of the employment verification method of claim 1:

- Claim 2 states that the "job applicant" in claim 1 is a "truck driver."  (*Id.* at 6:16-17.)

- Claims 3, 4 and 19 specify that the communication channel can be "an online interface, a facsimile interface, . . . an electronically stored data interface," (cl. 3) or a "phone interface," (cl. 19) and that the "online interface" can be a "wireless device" (cl. 4).  (*Id.* at 6:18-23, 6:66-67.)

8

- Claims 5, 6 and 14 pertain to sending data through the communication channels.  These claims specify that the communication channels used to receive data from the exchange can either be the same (cl. 5) or different (cl. 6) than the communication channel used to send data, and that data can be received through the communication channel of the job applicant (cl. 14).  (*Id.* at 6:24-32, 6:52-54.)

- Claim 7 adds "the step of denying access to a portion of the exchange based upon the attribute assigned" in claim 1.  (*Id.* at 6:33-35.)

- Claims 8 and 9 add a "unique identifier" to the data (cl. 8) and specify that the "unique identifier" can be a bar code (cl. 9).  (*Id.* at 6:36-40.)

- Claims 10-13 and 30 address obtaining an authorization (cl. 10) or refusal of authorization (cl. 12) for verification from either the provider or job applicant, specify that the authorization or refusal can be a digital signature (cls. 11 and 13) and explain that the authorization can be stored and transmitted through the exchange (cl. 30).  (*Id.* at 6:41-51, 8:14-18.)

- Claims 15-17 pertain to routing employment data to the job applicant, placing a hold on the verification data, and making corrections to it.  (*Id.* at 6:55-62.)  Claim 15 recites "the method according to claim 1 further comprising the step of routing verification data from the provider to the job applicant."  (*Id.* at 6:55-57.)  Claim 16 depends from claim 15 and simply states the "step of placing a hold status on the verification data."  (*Id.* at 6:58-59.)  Claim 17 depends from claim 16 and provides the step of "correcting the verification data before releasing the hold status."  (*Id.* at 6:60-62.)

- Claim 18 depends directly from claim 1 and adds "the step of checking a status of a verification transaction with the exchange."  (*Id.* at 6:63-64.)  Claims 20-23 address how

those involved are apprised of the transaction's current status.  (*Id.* at 7:1-17.)

- Claims 24-25 provide that the data from the verification transactions can be stored in a database.  (*Id.* at 7:18-8:2.)

- Claim 26 depends directly from claim 1 and adds "the step of generating a verification report containing a portion of the verification data of one or more of the job applicants." ('575 Patent at 8:3-5.)

- Claims 27-29 pertain to a "pricing model" for use of the system in claim 1.  Claim 27 states that assigning an attribute that "defin[es] the communication channel accessible to" the user of the computer exchange can be "based on a price model."  (*Id.* at 8:6-8.) According to claims 28 and 29, the pricing model can be a "flat fee" (cl. 28) or "transaction-based pricing based upon usage of the network" (cl. 29).  (*Id.* at 8:9-13.)

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss Under Rule 12(b)(6)

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted."  *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012).  In considering a motion to dismiss, a court must construe the allegations in the complaint "in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts alleged and drawing all permissible inferences in their favor."  *Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).  "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth."  *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009)).

It is appropriate to dismiss a complaint on a Rule 12(b)(6) motion where the asserted patent contains claims that are patent-ineligible under 35 U.S.C. § 101.  Whether a patent

satisfies the requirements of 35 U.S.C. § 101 is an issue of law that, in certain circumstances, may be based on underlying facts. *See SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (citing *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364-65 (Fed. Cir. 2018)). Courts therefore regularly rule on patent-eligibility on motions to dismiss where there are no genuine factual disputes. *See id.*; *Secured Mail*, 873 F.3d at 912-13.

Moreover, it is not necessary to engage in formal claim construction before analyzing patent eligibility in a Rule 12 motion made pursuant to Section 101. *Genetic Techs., Ltd. v. Merial LLC*, 818 F.3d 1369, 1373-74 (Fed. Cir. 2016); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (concluding, "[w]ithout purporting to construe the claims, as the district court did not," that the challenged claims were directed to an abstract idea implemented with "routine, conventional activity").

**B.      Patent Eligibility Under Section 101**

Patent law sets forth several requirements for a patent, including what subject matter is and is not eligible for patent protection. Section 101 addresses patent eligibility, stating specifically that an inventor may obtain a patent on "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. "The Supreme Court has 'long held that this provision contains an important implicit exception: laws of nature, natural phenomena, and abstract ideas are not patentable.'" *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

Courts use a two-part framework to determine whether patent claims improperly claim

laws of nature, natural phenomena, or abstract ideas. *Alice*, 573 U.S. at 217.[6]  The two parts of the framework are often referred to as "*Alice* Step One" and "*Alice* Step Two," and will be referred to as such in this motion.

Under *Alice* Step One, the court must "determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 573 U.S. at 218.  The first step "looks at the focus of the claims, their character as a whole." *SAP America*, 898 F.3d at 1167 (quotation and citations omitted).  If the Court determines that the claims are directed to a patent-ineligible concept, it must proceed to step two.

Under *Alice* Step Two, the Court "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 77-78).  The second step "looks more precisely at what the claim elements add—specifically, whether, in the Supreme Court's terms, they identify an 'inventive concept' in the application of the ineligible matter to which (by assumption at stage two) the claim is directed." *SAP America*, 898 F.3d at 1167 (quotation and citations omitted). Importantly for this case, at *Alice* Step Two, "[w]holly generic computer implementation is not generally the sort of 'additional feature' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Alice*, 573 U.S. at 223-24 (quoting *Mayo*, 566 U.S. at 77-78).

---

[6] Notably, the *Alice Corp. Pty. v. CLS Bank Int'l* decision, which was a seminal ruling on patent-eligibility that prompted the United States Patent & Trademark Office to change its examining standards for the patent-eligibility of computer-related inventions, *see* 79 CFR § 74618, was issued two years after the '575 Patent was granted.  The '575 Patent is precisely the type of patent those updated examining standards were designed to weed out.

**C.      Rule 12(b)(6) Motions Based on Section 101 After *Berkheimer***

Recently, the Federal Circuit issued an opinion addressing the legal and factual nature of the Section 101 inquiry.  In *Berkheimer*, the Federal Circuit addressed the propriety of ruling on a Section 101 issue on a motion to dismiss where there are factual issues at *Alice* step two, particularly regarding whether the claimed technology was "well-understood, routine and conventional."  881 F.3d at 1370-71.  The Court concluded that "whether a claim element or combination of elements is well-understood, routine and conventional . . . is a question of fact." *Id.* at 1368.  However, "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry."  *Id.* (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015)).

In denying a rehearing *en banc* in *Berkheimer*, the Federal Circuit explained that while the *Alice* Step Two analysis requires "evidence supporting a finding that the additional elements [in the patent claims] were well-understood, routine, and conventional," it is entirely appropriate to rely on the patent specification alone to provide such evidence.  *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1371 (Fed. Cir. 2018) (emphasis added).  Indeed, the court explained, "[i]n a situation where the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute."  *Id.* (citing *Pharmastem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007)); *see also Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 995 (Fed. Cir. 2018) (affirming judgment on the pleadings of patent-ineligibility where "the specification [did not] support [plaintiff's] contention that there [was] a factual dispute regarding whether the claims recite routine and conventional RFID components").  And as explained in Section III.B.2,

below, this exact situation is present here—the text of the '575 Patent itself shows that the

claimed methods do not satisfy the *Alice* two-step inquiry.

Notably, after *Berkheimer*, the Federal Circuit has continued to find that ruling on

Section 101 issues is appropriate on a Rule 12(b)(6) or Rule 12(c) motion.  *See Voter Verified,*

*Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1384 (Fed. Cir. 2018) ("Patent eligibility

can be determined at the Rule 12(b)(6) stage 'when there are no factual allegations that, taken as

true, prevent resolving the eligibility question as a matter of law.'" (quoting *Aatrix Software, Inc.*

*v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018)); *Data Engine Techs. LLC*

*v. Google LLC*, 906 F.3d 999, 1002 (Fed. Cir. 2018) (affirming in part a district court's decision

on a motion for judgment on the pleadings under Rule 12(c)); *SAP America*, 898 F.3d at 1170

(affirming district court's judgment on a Rule 12(c) motion); *Burnett v. Panasonic Corp.*, 741 F.

App'x. 777 (Fed. Cir. 2018) (affirming district court's finding of patent-ineligibility on a Rule

12(b)(6) motion); *see also In re Villena*, No. 2017-2069, 2018 WL 4145863, at *2 (Fed. Cir.

Aug. 29, 2018) ("Not every § 101 determination contains genuine disputes regarding underlying

facts material to the § 101 inquiry." (citing *Berkheimer*, 881 F.3d at 1368)).  Numerous district

courts have found the same.[7]

---

[7] *See Epic IP LLC v. Backblaze, Inc.*, No. CV 1:18-141-WCB, 2018 WL 6201582, at *14 (D.
Del. Nov. 26, 2018) ("District courts have frequently decided section 101 issues on motions to
dismiss, and the Federal Circuit has approved of that procedure on numerous occasions,
including in cases postdating the decisions in *Aatrix* and *Berkheimer*."); *Secure Cam, LLC v.*
*Tend Insights, Inc.*, No. 5:18-CV-02750-EJD, 2018 WL 5982869 (N.D. Cal. Nov. 14, 2018);
*Consumer 2.0, Inc. v. Tenant Turner, Inc.*, No. 2:18CV355, 2018 WL 5668617, at *10 (E.D. Va.
Nov. 1, 2018); *Thunder Power New Energy Vehicle Dev. Co. v. Byton N. Amer. Corp.*, No. 18-
CV-03115-JST, 2018 WL 5734616, at *3 (N.D. Cal. Oct. 31, 2018); *CardioNet, LLC v.*
*InfoBionic, Inc.*, No. 17-CV-10445-IT, 2018 WL 5017913, at *8 (D. Mass. Oct. 16, 2018);
*Uniloc USA, Inc. v. HTC Am., Inc.*, No. C17-1558JLR, 2018 WL 3008870, at *12 (W.D. Wash.
June 15, 2018); *TriPlay, Inc. v. WhatsApp Inc.*, No. CV 13-1703-LPS-CJB, 2018 WL 1479027,
at *1 (D. Del. Mar. 27, 2018), *reconsideration denied*, No. CV 13-1703-LPS-CJB, 2018 WL

## III.   ARGUMENT

The claims of the '575 Patent are ineligible for patent protection under 35 U.S.C. § 101 because they are directed to an abstract idea and there is no inventive concept in the claims sufficient to transform the abstract idea into a patentable invention.  Under *Alice* Step One, the Court should find that the claims of the '575 Patent are all directed to an abstract idea—namely, the general concept of collecting and exchanging employment-related information.  This is particularly true when applied to the commercial trucking industry (as the Complaint alleges), since the process of collecting and exchanging employment information in that industry has been federally mandated for decades.  (*See, e.g.*, 49 CFR § 391.23.)  Under *Alice* Step Two, there is no inventive concept sufficient to save the claims from patent-ineligibility because the claims merely specify that this abstract idea is implemented using generic computer components and communication channels (e.g., a fax or a phone) that, as the patent itself acknowledges, were already well-known, routine and conventional.  Thus, the claims of the patent are invalid, and the Court should grant DriverReach's Motion to Dismiss.

### A.   Claim 1 is an Appropriate Representative Claim.

In the Section 101 analysis, the Court should treat claim 1 as a representative claim.[8]  It is appropriate to address the patent-eligibility of a representative claim where there is no distinctive significance in the claim limitations in the other claims.  *Berkheimer*, 881 F.3d at 1365.  Indeed,

---

3545500 (D. Del. July 24, 2018); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 316 F. Supp. 3d 1138 (N.D. Cal. 2018).

[8] Tenstreet only explicitly asserts in its Complaint that DriverReach infringes claim 1.  (*See* Dkt. 1, ¶ 16; *see also id.* at ¶ 17 (alleging that DriverReach's VOE Plus platform meets the limitations of claim 1).)  But Tenstreet's wording, alleging that DriverReach infringes "at least claim 1," suggests that Tenstreet might attempt to allege that DriverReach infringes additional dependent claims.  (*See id.* at ¶ 16.)  Any attempt by Tenstreet to assert any dependent claims other than claim 1 would be unsuccessful because the 29 claims that depend from claim 1 are also patent-ineligible.  (*See* Sect. III.C., *infra*.)

where "the claims of the asserted patents are substantially similar in that they recite little more than the same abstract idea," it is "unnecessary" to address each claim individually.  *Content Extraction*, 776 F.3d at 1348.

Here, there is nothing in the claims that depend from claim 1 that requires those claims to be treated independently.  *See Berkheimer*, 881 F.3d at 1365; *Content Extraction*, 776 F.3d at 1348.  The remaining 29 claims in the patent merely add insignificant, additional abstract ideas or generic computer processes to the abstract idea of claim 1.  *See RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("Adding one abstract idea (math) to another abstract idea (encoding and decoding) does not render the claim non-abstract."); *SAP America*, 898 F.3d at 1169 (finding no inventive concept in dependent claims because they "add nothing outside the abstract realm"); *Voter Verified*, 887 F.3d at 1386 ("all of the remaining claims only recite different variations of the same abstract idea being performed with other generic computer components. . .").

Although it is appropriate to treat claim 1 as representative, for the sake of completeness this motion explains why all of the claims in the '575 Patent are patent-ineligible.[9]

**B.     Claim 1 is Patent-Ineligible Under Section 101.**

**1.      *Alice* Step One: Claim 1 of the '575 Patent is Directed to an Abstract Idea.**

At step one, the Court must evaluate "whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea.  *Alice*, 573 U.S. at 218.  The Court must consider the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter."  *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).

---

[9] DriverReach notes claim construction is not necessary for the Court to rule on patent-eligibility. No reasonable claim construction could change the claims into patentable-subject matter.

The relevant inquiry for this type of patent at step one is "to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016); *see also BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1285-86 (Fed. Cir. 2018).  "[M]ethods of organizing human activity" are abstract ideas, not improvements to computer functionality.  *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016); *See Alice*, 573 U.S. at 220 (method of organizing human activity, namely "the use of a third party to mitigate settlement risk," an abstract idea).  Further, "claims directed to the collection, storage, and recognition of data" are also "directed to an abstract idea," not improvements to computer technology.  *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1372 (Fed. Cir. 2017) (collecting cases); *see Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018) ("[A]cquiring and organizing information . . . is an abstract idea, not an improvement in how computers and networks carry out their basic functions."); *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("The invention's 'communication between previously unconnected systems . . . ' does not amount to an improvement in computer technology.") (citation omitted); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("The advance [the claims] purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions. They are therefore directed to an abstract idea."); *Content Extraction*, 776 F.3d at 1347 ("[T]he claims . . . are drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory.").

District courts from this and other Circuits have reached the same conclusion that

transmitting and storing data is an abstract idea.  *See Neochloris, Inc. v. Emerson Process Mgmt. LLLP*, 140 F. Supp. 3d 763, 771 (N.D. Ill. 2015) ("[T]he claims . . . only describe the abstract idea of collecting data, monitoring the data, processing results, and alerting the user of the results."); *Cellspin Soft*, 316 F. Supp. 3d at 1152  (using known computer components to automatically "perform the same process of acquiring, transferring, and publishing data that humans previously performed by using existing wireless protocols and other well-known technology" is an abstract idea).  Courts have also found that merely "recit[ing] a method of facilitating relationships between two parties through a computer system intermediary" is an abstract idea.  *See Distefano Patent Trust III, LLC v. LinkedIn Corp.*, No. 17-1798-LPS-CJB, 2018 WL 4674571, at *5-7 (D. Del. Sept. 28, 2018); *see also Alice*, 573 U.S. at 219-20 (Claims to a "method of exchanging financial obligations between two parties using a third-party intermediary to mitigate settlement risk" directed to the abstract idea of "intermediated settlement").

Here, claim 1 of the '575 Patent is directed to a method of organizing human activity that simply requires a generic computer to collect, store, and recognized data; therefore, for multiple reasons it is directed to an abstract idea and not an improvement to computer functionality.  *See, e.g.*, *Enfish*, 822 F.3d at 1335; *In re TLI*, 823 F.3d at 613; *Smart Sys.*, 873 F.3d at 1372.  Claim 1 purports to cover the abstract idea of using a generic computerized exchange network to perform the traditional human activity of requesting, providing, routing, and storing employment verification information.  Specifically, claim 1 recites a "method for peer-to-peer sharing of job applicant verification data over a network" in which "a requester" and "a provider" exchange information requests and responses.  The specific steps in claim 1 generically recite "receiving" and "routing" information sent between those entities over general communication channels, as

well as "comparing" that information with unspecified "requirements."

The only "computer" component in claim 1 is a generic "computerized exchange," which does nothing more than the generic step of "comparing" received information "with requirements." ('575 Patent at 5:64-65.)  Even the "communication channels" are generically described and claimed.  (*See id.* at cl. 1 (reciting the step of "allowing" a communication channel to interface with the exchange); *see also id.* at 1:52-54 (the "communication channel may be an online interface, a facsimile interface, or an electronically stored data interface").)  Although the claims purport to recite a "peer-to-peer" network for sharing job applicant verification data, there is nothing in claim 1 that purports to claim a new technological advance over existing peer-to-peer computer networks, nor does anything in claim 1 relate to improvements to computer functionality.  Instead, the heart of claim 1 is the abstract idea of using a generic computer to collect and exchange employment verification data.

The specification of the '575 Patent confirms that claim 1 is nothing more than an attempt to preempt an ineligible abstract idea.  For example, the written description makes clear that the claimed method involves nothing more than using a generic computing device to facilitate a conventional "verification process" using various well-known, conventional communication channels—i.e., "a mix of manual fax processes, incomplete commercial employment history databases, and phone calls."  ('575 Patent at 1:18-35; *see also* the annotated flowchart in Sect. I.C.1, *supra*.)  Moreover, the alleged "novel approach" in the '575 Patent is admittedly not an improvement in computing technology, but instead simply incorporating allegedly "unique components of technology" invented by others and using those existing tools "in a holistic approach to the entire [applicant verification] process."  (*Id.* at 1:33-35; *see also* Sect. I.C, *supra*.)  In other words, the '575 Patent reflects the fact that the claims simply combine

"off-the-shelf" and "conventional" technology.  *Elec. Power Grp.*, 830 F.3d at 1355 (finding

ineligible under Section 101 and explaining that "[n]othing in the claims, understood in light of

the specification, requires anything other than off-the-shelf, conventional computer, network, and

display technology for gathering, sending, and presenting the desired information.").

Thus, the Court should find that claim 1 recites nothing more than the abstract idea of

collecting and exchanging employment-related information.  And with that finding, the Court

must move to *Alice* Step Two.

### 2.    *Alice* Step Two: Claim 1 Does Not Contain an "Inventive Concept" Sufficient to Transform the Abstract Idea into Patent-Eligible Subject Matter.

At step two, the Court must "examine the elements of the claim to determine whether it

contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-

eligible application."  *Alice*, 573 U.S. at 221 (quoting *Mayo*, 566 U.S. at 72, 79).  "Step two is 'a

search for an inventive concept—i.e., an element or combination of elements that is sufficient to

ensure that the patent in practice amounts to significantly more than a patent upon the ineligible

concept itself.'"  *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir.

2016) (quoting *Alice*, 573 U.S. at 218).  "This inventive concept must do more than simply recite

'well-understood, routine, conventional activity.'"  *FairWarning*, 839 F.3d at 1093 (quoting

*Mayo*, 566 U.S. at 79).  "To save a patent at step two, an inventive concept must be evident in

the claims."  *Secured Mail*, 873 F.3d at 911 (citing *Recognicorp*, 855 F.3d at 1327); *see also*

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017).

Furthermore, as noted above, the *Alice* Step Two analysis should be resolved in a Rule 12

Motion when there are no genuine factual disputes as to whether the claimed invention recites

"well-understood, routine, and conventional" steps, particularly when the patent itself provides

that evidence—as is the case here.  *Berkheimer*, 890 F.3d at 1371.  Indeed, as the Federal Circuit

explained, "[i]n a situation where the [patent's] specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute." *Id.* (citing *Pharmastem*, 491 F.3d at 1362).

For each of the reasons explained below, claim 1 also fails *Alice* Step Two.

> **a.      Claim 1 relies on generic computer functions to do no more than simply automate traditionally manual tasks.**

"Generic computer functions" do not transform an abstract idea into a patent-eligible invention. *Alice*, 573 U.S. at 225-26. Thus, "[m]erely reciting the use of a generic computer or adding the words 'apply it with a computer' cannot convert a patent-ineligible abstract idea into a patent-eligible invention." *Secured Mail*, 873 F.3d at 911 (citing *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1332 (Fed. Cir. 2015)). Indeed, the Federal Circuit has distinguished between patent claims that "improve the functioning of the computer itself"—which may be patent eligible—and those that simply "use generic computers to perform generic computer functions"—which are not eligible under Section 101. *Symantec*, 838 F.3d at 1315; *accord FairWarning*, 839 F.3d at 1096 ("[T]he use of generic computer elements like a microprocessor or user interface do not alone transform an otherwise abstract idea into patent-eligible subject matter." (citing *DDR Holdings*, *LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014))); *see also Gaelco S.A. v. Arachnid 360 LLC*, 293 F. Supp. 3d 783, 791 (N.D. Ill. 2017), *aff'd*, 742 F. App'x 512 (Fed. Cir. 2018) (collecting cases).

Here, claim 1 is simply a method of communicating over a peer-to-peer network operating on a generic computer. Claim 1 confirms that this network includes a "computerized exchange" that: (i) "manag[es]" the interactions on the network—i.e., between the "providers," "requesters," and "job applicants"—by allowing these individuals to communicate with the exchange via conventional "communication channels" (*see supra*, Table 1, elements a & b); and

(ii) "compar[es]" the "verification request" (i.e., the request submitted by the requester) with "requirements" (*see supra*, Table 1, element e).

Sending information over a computer network is "not even arguably inventive." *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014). Neither claim 1 itself or the '575 Patent generally describe the structure or anything more than the general operation of the computer network, let alone purport to invent a new computer network. (*See generally* '575 Patent.) Nor does the '575 Patent purport to provide any technological advances over existing computer networks. (*Id.*) In fact, the '575 Patent's specification confirms that no such improved system or network is intended; rather, the specification admits that the alleged "novel" solution here is nothing more than using known technology and combining it "in a holistic approach to the entire [known] process." (*Id.* at 1:32-34; *see also id.* at 2:64-67 ("The network manages the complexity associated with different parties participating in different ways . . . so that individual participants do not have to manage it for themselves.").) In short, claim 1 uses only generic computer elements and processes simply to automate a process that can be, and long has been, performed manually by humans.

Thus, claim 1 taken as a whole is directed to the application of a generic computer network that "behave[s] exactly as expected according to [its] ordinary use"—i.e., to facilitate a series of straightforward communications between requesters, providers, and job applicants, and store the collected data for future use—which is not an inventive concept sufficient to transform claim 1 into patentable subject matter. *See TLI*, 823 F.3d at 615 (no inventive concept where "the recited physical components behave exactly as expected according to their ordinary use."). Said another way, there can be no genuine factual dispute that a generic "computer exchange" that replaces the role of a human resources professional in collecting, transmitting, and saving

employment verification data in a database is not the "inventive step" required at step two of the *Alice*/*Mayo* framework.  And this is certainly true where, as here, the data collection process in question was federally regulated well before the 2007-2008 timeframe when the application underlying the '575 Patent was filed.  (*See, e.g.*, 49 CFR § 391.23.)

       **b.**   **Claim 1 merely uses a computer to perform routine tasks more accurately.**

The Federal Circuit has also made clear that "relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim [containing an abstract idea] patent eligible."  *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015).  Indeed, a claim must do more than take advantage of "the improved speed or efficiency inherent with applying the abstract idea on a computer."  *Capital One Bank (USA)*, 792 F.3d at 1367 (citing *Bancorp Servs. LLC v. Sun Life Assurances Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012)); *accord FairWarning*, 839 F.3d at 1094-95 ("Although [the] claims require the use of a computer, it is this incorporation of a computer, *not* the claimed rule, that purportedly 'improve[s] [the] existing technological process' by allowing the automation of further tasks." (quoting *Alice*, 573 U.S. at 223)); *see also O2 Media, LLC v. Narrative Sci. Inc.*, 149 F. Supp. 3d 984, 998 (N.D. Ill. 2016) ("[C]ourts have routinely rejected the 'computers are more efficient' argument as an inventive implementation of an abstract idea.") (citing *Capital One Bank (USA)*, 792 F.3d at 1370; *Versata Dev.*, 793 F.3d at 1335)).

Claim 1 of the '575 Patent is precisely the type of claim the foregoing cases have found to be ineligible, as there is nothing in claim 1 transforms the abstract idea of collecting and exchanging employment verification data into patent-eligible subject matter.  Instead, claim 1 simply recites using a generic computer to serve as a conduit (*see supra*, Table 1, element a) for performing well-known steps of verifying employee data and information (*id.* at elements b-h)

and specifies that a provider in one transaction may be a requester in subsequent transactions, while a requester in the first transaction may be a provider in subsequent transactions (*id.* at element i).  The specification makes clear that this system is merely designed to increase the efficiency of the then-existing process of human interactions and communications—which the '575 Patent describes a "time consuming," "expensive" and difficult to fix if there were data errors.  ('575 Patent at 1:24-29.)  The specification also states that the alleged invention is an advance over traditional employment verification processes because it provides one channel for managing the flow of employment verification information.  (*Id.* at 3:40-43.)  These alleged "improvements," however, are not inventive—they are nothing more than "relying on a computer to perform routine tasks more quickly or more accurately."  *OIP Techs.*, 788 F.3d at 1363; *see also Epic IP LLC v. BackBlaze, Inc.*, No. CV 1:18-141-WCB, 2018 WL 6201582, at *3 (D. Del. Nov. 26, 2018) ("Nor does the fact that a computer can perform [methods of organizing human activity] more rapidly and efficiently make an abstract idea any less abstract or any more patent-eligible.") (collecting cases).

**c.   Claim 1 merely uses a computer to perform tasks conventionally performed by a human.**

A patent claim that merely uses a generic computer to perform tasks that are conventionally performed by humans is not inventive.  *See Symantec*, 838 F.3d at 1318 (claims directed to "abstract ideas" that were "fundamental practices long prevalent in our system and method of organizing human activity" contained no inventive concept where they were merely performed using "generic computer-implemented steps" (citations and internal quotation marks omitted)); *Tangelo IP, LLC v. Tupperware Brands Corp.*, No. 18-CV-692-RGA, 2018 WL 6168083, at *4 (D. Del. Nov. 26, 2018) (using a generic computer environment to obtain information conventionally provided by a sales representative not an "inventive concept").  That

24

is precisely what claim 1 is doing—it is simply implementing via a computer network a method traditionally employed by humans during the hiring process.

Elements b-h (as depicted in Table 1, *supra*) of claim 1 all relate to the basic steps that any human being in 2007-2008 who was screening a potential employee—particularly one in which the employment is conditioned on federally-mandated data verification processes—would have employed.   The '575 Patent admits this.  (*See* '575 Patent at 1:18-35, 3:33-35.)  Moreover, the last step in the claimed method (element i, *see supra*, Table 1) again merely recites a basic premise underlying any hiring process—i.e., that a "requester" (i.e., a prospective employer) can later become a "provider" (i.e., a former employer), and vice versa.  There can be no reasonable dispute that this recites a basic employment concept that is not inventive—Company A can hire an applicant one day and seek employment verification information from Company B about that employee, and vice versa the next day.  *See also Finnavations LLC v. Payoneer, Inc.*, No. 1:18-CV-00444-RGA, 2018 WL 6168618, at *4 (D. Del. Nov. 26, 2018) ("Unlike the improvements to computer technology that the Federal Circuit has found eligible at *Alice* step two, the claims here merely apply an 'old solution' (bookkeeping) in a computer environment without specifying any non-conventional way to accomplish or practice the idea.").

Because claim 1 merely recites the use of a computer to perform tasks conventionally performed by a human, it does not contain the "something more" required for patent-eligibility at *Alice* Step Two.

> **d.    Ordered combinations of the elements of claim 1 do not transform the abstract idea into patent-eligible subject matter.**

Finally, ordered combinations of the elements of claim 1 do not transform the abstract idea embodied by claim 1 into patent-eligible subject matter.  In combination, the claim elements, "ad[d] nothing . . . that is not already present when the steps are considered

separately." *Alice*, 573 U.S. at 225 (quoting *Mayo*, 566 U.S. at 79).  Claim 1 does not describe

any inventive way to achieve the desired results, nor does it represent an improvement to peer-to-

peer networks, computers, or computer-implemented software.  In sum, claim 1 fails to recite

additional elements—alone or in combination—that transform abstract ideas embodied by claim

1 into patent-eligible subject matter under the second step of the *Alice* test.

For these reasons, claim 1 of the '575 Patent fails at step two of the *Alice* framework.

**C.      Claims 2-30 Are Also Patent-Ineligible Under Section 101.**

The claims that depend from claim 1 do not contain any element or ordered combination

of elements sufficient to transform the abstract idea of claim 1 into patent-eligible subject matter.

Certain dependent claims "simply append[] conventional steps, specified at a high level of

generality," to claim 1, which is not enough to supply an "inventive concept."  *See Alice*, 573

U.S. at 222; *see also id.* at 223 ("limiting the use of an abstract idea 'to a particular technological

environment'" is "not enough for patent eligibility") (quoting *Bilski v. Kappos*, 561 U.S. 593,

610-11 (2010)).  And other dependent claims merely recite additional abstract ideas.  *Cf.*

*Consumer 2.0, Inc. v. Tenant Turner, Inc.*, No. 2:18CV355, 2018 WL 5668617, at *7 (E.D. Va.

Nov. 1, 2018) (explaining that "the mere combination of [abstract ideas] is insufficient to bring

the patent-at-issue out of the realm of the abstract.") (collecting cases).

Tenstreet has not specifically alleged that DriverReach infringes any of the dependent

claims, (*see generally* Dkt. 1), and as explained above in Section III.A, claim 1 is an appropriate

representative claim because there is nothing in the dependent claims that requires them to be

addressed separately for purposes of the Section 101 analysis.  Nevertheless, DriverReach

discusses the dependent claims below to demonstrate that any attempt by Tenstreet to allege that

DriverReach infringes any dependent claim would be futile because the dependent claims are no

more patent-eligible under Section 101 than claim 1 standing alone.

*Claim 2.*   Claim 2 states that the "job applicant" in claim 1 is a "truck driver."  ('575 Patent at 6:16-17.)  Specifying that person whose employment data is verified through the method of claim 1 merely narrows the abstract idea of claim 1 and is not the slightest bit inventive.  *See SAP America*, 898 F.3d at 1169 (features that merely "provide further narrowing" of an abstract idea do not confer patent-eligibility); *RecogniCorp*, 855 F.3d at 1327 ("Adding one abstract idea (math) to another abstract idea (encoding and decoding) does not render the claim non-abstract."); *Consumer 2.0*, 2018 WL 5668617, at *7 ("[T]he mere combination of [abstract ideas] is insufficient to bring the patent-at-issue out of the realm of the abstract.") (collecting cases).  Indeed, the specification acknowledges as much, stating that "Federal regulations *require* that carriers complete a thorough verification process before hiring a *commercial driver*."  ('575 Patent at 1:18-19 (emphasis added); *see also* 49 CFR § 391.23.)  Claim 2 is patent-ineligible for these reasons.

*Claims 3, 4 and 19.*   These claims specify that the communication channel in claim 1 can be "an online interface, a facsimile interface, . . . an electronically stored data interface," (cl. 3) or a "phone interface," (cl. 19) and that the "online interface" can be a "wireless device" (cl. 4).  ('575 Patent at 6:18-23, 6:66-67.)  These claims simply narrow the abstract idea of claim 1 by reciting the use of traditional "communication channels" to transmit the information about a job applicant.  The specification explicitly acknowledges that the customary practice at the time of the invention was to collect and exchange employment verification data using online requests, faxes, and the telephone.  (*Id.* at 1:21-24, 3:33-35.)  And there is nothing in the specification to suggest that the inventors made any improvements or changes to these indisputably well-known and conventional communication channels.  (*See generally id.*)

Put simply, "generic computer components such as an 'interface,' 'network,' and 'database'" do not meet the inventive concept requirement.  *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016); *see Capital One Bank (USA)*, 792 F.3d at 1370 ("[An] interactive interface limitation is a generic computer element.").  Nor does the inclusion of "concrete, tangible components" in the claims such as the "phone interface" or "wireless device" change the outcome.  *See TLI*, 823 F.3d at 611 ("concrete, tangible components such as 'a telephone unit' and a 'server,' . . . merely provide[d] a generic environment in which to carry out [an] abstract idea"); *Gaelco S.A.*, 293 F. Supp. 3d at 793 ("This Court . . . joins the numerous other courts that have found claims to be directed to abstract ideas despite the fact that they required generic hardware components." (collecting cases))

These claims that recite the use of indisputably well-known communications channels to practice the method of claim 1 are not the "something more" required to establish an "inventive concept."  Claims 3, 4 and 19 are therefore patent-ineligible under Section 101.

*Claims 5, 6 and 14.*  These claims pertain to sending data through the claimed "communication channels."  Claims 5 and 6 specify that the "communication channels" used to receive data from the exchange in claim 1 can either be the same (cl. 5) or different (cl. 6) than the communication channel used to send data to the exchange.  ('575 Patent at 6:24-32.)  Claim 14 specifies that data can be received through the communication channel of the job applicant (cl. 14).  (*Id.* at 6:24-32, 6:52-54.)  Thus, these claims merely recite that the abstract idea of sending and receiving employment data in claim 1 can be done using the same or different "communication channels."  Courts have consistently found sending, collecting and displaying data to be abstract.  *Two-Way Media*, 874 F.3d at 1337 (claims directed to the abstract idea of "sending information"); *Consumer 2.0*, 2018 WL 5668617, at *7 (claims directed to abstract idea

of "collecting and displaying data").  There is no basis for a different conclusion here.

**Claim 7.**  Claim 7 adds "the step of denying access to a portion of the exchange based upon the attribute assigned" in claim 1.  ('575 Patent at 6:33-35.)  Using computer-based rules to define the content available to specific users is a generic computer function that is not an inventive concept.  *See O2 Media*, 149 F. Supp. 3d at 997 ("management tool" which "presents customized webpage content based on user-specific information" not an inventive concept).

**Claims 8 and 9.**  These claims add a "unique identifier" to the data (cl. 8) and specify that the "unique identifier" can be a bar code (cl. 9).  ('575 Patent at 6:36-40.)  There is no inventive concept in the individual elements or combinations of elements in these claims.  The patent provides no description of how the unique identifier is generated and does not purport to claim that it provides an improvement over routine and conventional methods of generating unique identifiers.  (*See generally id.* at 2:52-5:39.)  Instead, attributing a unique identifier, which may be a barcode, has been a well-known and conventional way of organizing and communicating information about data since at least the 1980s.  *See Secured Mail*, 873 F.3d at 911-12 (unique identifier not inventive where "claim language does not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it").

Adding a unique identifier so that it is possible to track who can access what data or portions of the computer exchange is the type of "feature . . . that flow[s] naturally from the use of computers to perform functions previously performed manually" that "do[es] not establish the existence of an inventive concept."  *Tech. Dev. & Licensing, LLC v. Comcast Corp.*, 258 F. Supp. 3d 884, 891 (N.D. Ill. 2017); *see also Motivation Innovations, LLC v. Petsmart, Inc.*, 156 F. Supp. 3d 558, 568-69 (D. Del. 2016) (method using a "machine readable identification code" to take discount offers and track customer purchasing habits was merely "routine and

29

conventional" computer technology).

***Claims 10-13 and 30.***  Claims 10-13 and 30 address obtaining an authorization for verification from either the provider or job applicant (cl. 10) or refusal of authorization (cl. 12), specify that the authorization or refusal can be a digital signature (cls. 11 and 13) and explain that the authorization can be stored and transmitted through the exchange (cl. 30).  ('575 Patent at 6:41-51, 8:14-18.)  The specification describes that after a request is sent through the communication channel, an authorization for verification by the job applicant is typically required.  (*Id.* at 1:58-61.)

These dependent claims contain no inventive concept because they simply address the automation of the human interaction of seeking approval from a job applicant to acquire information about that job applicant's work or school history.  *See Content Extraction*, 776 F.3d at 1345-48 (no inventive concept in patent claim for extracting data from hard copy documents and storing that information in electronic memory because "humans have always performed these functions," and the software used to extract the data "was well-known at the time of filing").  Moreover, claims that require "functional results" such as "obtaining," but do not sufficiently describe how to achieve these results in a non-abstract way are patent-ineligible under Section 101.  *See Two-Way Media*, 874 F.3d at 1337-38.

Thus, these claims do not change the conclusion at step one that the claims of the '575 Patent merely recite the abstract idea of collecting and exchanging employment-related information.  Rather, these claims merely narrow the abstract idea by incorporating the requirement that the job applicant must give his or her authorization for employment information to be collected and exchanged.  And nothing in the limitations of these claims, viewed alone or in combination, is sufficient to cause these claims to pass must under *Alice* step two.

*Claims 15-17.*  These claims pertain to routing employment data to the job applicant, placing a hold on the verification data, and making corrections to it.  ('575 Patent at 6:55-62.) Claim 15 recites "the method according to claim 1 further comprising the step of routing verification data from the provider to the job applicant."  (*Id.* at 6:55-57.)  Claim 16 depends from claim 15 and simply states the "step of placing a hold status on the verification data."  (*Id.* at 6:58-59.)  Claim 17 depends from claim 16 and provides the step of "correcting the verification data before releasing the hold status."  (*Id.* at 6:60-62.)

Claims 15-17 merely recite steps that could be, and in fact have long been, performed by humans.  Specifically, prospective job applicants have long performed the steps of receiving data about their previous work and educational history, verifying the accuracy of the data, and having corrections made (if necessary).  Indeed, if that were not true, then compliance with the federal regulations governing pre-employment verification processes in the trucking industry would have been impossible.  (*See* '575 Patent at 3:48-51 (acknowledging drivers have "a number of protections under FCRA and DOT regulations against inaccurate data being shared with prospective employers," and drivers can "participate" with the claimed "exchange" to "exercise their rights according to the laws"); *see also* 49 CFR § 391.23(i)(1) (driver has "[t]he right to review information provided by previous employers" and "[t]he right to have errors in the information corrected by the previous employer"); 49 CFR § 391.23(g)(3) ("After October 29, 2004, previous employers must" "[p]rovide specific contact information in case a driver chooses to contact the previous employer regarding correction or rebuttal of the data."); *see also supra*, footnote 2 (the court may take judicial notices of facts such as the existence of regulations in ruling on a motion to dismiss).)  These methods of conducting human activity are therefore not the "something more" required to transform the claims into patent-eligible subject matter.  *See*

*Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069, 1090-92 (N.D. Cal. 2016) (noting that the "steps of the asserted claims reflect activity described by the specification as previously having been carried out by humans" and finding patent directed to a patent-ineligible abstract idea); *Walker Digital, LLC v. Google, Inc.*, 66 F. Supp. 3d 501, 507-09 (D. Del. 2014) (no inventive concept where "all of these steps could be performed (and have been performed) by human beings interacting with one another prior to the filing of the [asserted patent].").

  ***Claims 18 and 20-23.*** Claim 18 depends directly from claim 1 and adds "the step of checking a status of a verification transaction with the exchange."  ('575 Patent at 6:63-64.) Claims 20-23 address how those involved in the transaction are apprised of the current status of the transaction.  (*Id.* at 7:1-17.)

  "The Federal Circuit has found that claims directed at collecting information, analyzing it, and displaying results of the collection are focused on an abstract idea."  *Secure Cam, LLC v. Tend Insights, Inc.*, No. 5:18-CV-02750-EJD, 2018 WL 5982869, at *4 (N.D. Cal. Nov. 14, 2018) (citing *Elec. Power Grp.*, 830 F.3d at 1353); *see also Consumer 2.0*, 2018 WL 5668617, at *4 ("Claims encompassing the idea of sending a request, receiving back a command, and executing a command to operate a device in a known and expected way have also been found to be abstract.").  Here, claims 18 and 20-23 merely address the abstract idea of analyzing the current status of the verification request and displaying the results of that analysis to a user.  *See also Coqui Techs., LLC v. Gyft, Inc.*, No. CV 17-777-CFC-SRF, 2018 WL 6033479, at *4 (D. Del. Nov. 16, 2018) (claims to a "gift certificate service system" that included "means" to "check the existence state of the gift certificate . . . and notify the parties in message format of the changes" were directed to the abstract idea of "selling, gifting, and using electronic gift certificates").  There is no inventive concept in these claims sufficient to confer patent-eligibility.

*Claims 24-25.*  Claims 24-25 provide that the data from the verification transactions in claim 1 can be stored in a database (cl. 24) and the database can be used to provide a portion of the verification data (cl. 25).  ('575 Patent at 7:18-8:2.)  There is no inventive element or combination of elements in these claims that transforms the abstract idea of claim 1 into patent-eligible subject matter.  "[E]lectronic recordkeeping . . . is 'one of the most basic functions of a computer.'"  *Finnavations*, 2018 WL 6168618, at *4 (quoting *Alice*, 573 U.S. at 225).

Indeed, the '575 Patent explicitly acknowledges that the use of commercial databases to store and acquire employment history data was known in the industry and was part of the "current process" for employment verification.  ('575 Patent at 1:21-24.)  And the Federal Circuit has held that a "database" is a "generic computer element[]" that is not an "inventive concept."  *Capital One Bank (USA)*, 792 F.3d at 1368.  Specifying in the claims that data collected during employment verification transactions can be stored in a centralized database and "used to provide a portion of the verification data" is simply a recitation of "well understood, routine, conventional activity" that does not save these claims from patent-ineligibility.  *FairWarning*, 839 F.3d at 1093 (quoting *Mayo*, 566 U.S. at 79).

*Claim 26.*  Claim 26 depends directly from claim 1 and adds "the step of generating a verification report containing a portion of the verification data of one or more of the job applicants."  ('575 Patent at 8:3-5.)  "The Federal Circuit has found that claims directed at collecting information, analyzing it, and displaying results of the collection are focused on an abstract idea."  *Secure Cam*, 2018 WL 5982869, at *4 (citing *Elec. Power Grp.*, 830 F.3d at 1353); *see also SAP America*, 898 F.3d at 1167 (claims focused on "selecting certain information, analyzing it . . . and reporting or displaying the results of the analysis were "all abstract").  Here, claim 26 merely claims the abstract idea of using a generic computer to display

33

the results of the collection of employment data.

***Claims 27-29.***  Claim 27 depends directly from claim 1 and states that assigning an attribute that "defin[es] the communication channel accessible to" the user of the computer exchange can be "based on a price model."  ('575 Patent at 8:6-8.)  According to claims 28 and 29, the pricing model can be a "flat fee" (cl. 28) or "transaction-based pricing based upon usage of the network" (cl. 29).  (*Id.* at 8:9-13.)

Claim 27 merely adds a step to the abstract idea of collecting and exchanging employment verification—namely, the step of using a pricing structure to control communication pathways—in a manner that is nothing more than providing an organizational hierarchy, which is not inventive.  *See Versata Dev.*, 793 F.3d at 1333-34 ("Using organizational and product group hierarchies to determine a price is an abstract idea that has no particular concrete or tangible form or application.").  And claims 28-29 do not recite any technological improvement associated with the pricing model.  Instead, they simply recite the unremarkable, "fundamental economic concept" of requiring payment for a service according to a pricing model.  *See OIP Techs.*, 788 F.3d at 1362-63 (claims directed to automatic price optimization in an e-commerce setting "at best" "describe[d] the automation of the fundamental economic concept of offer-based price optimization through the use of generic-computer functions").  The generic concept of allowing users to access a system according to a pricing structure is "not . . . a technological improvement of any kind."  *See IQS US Inc. v. Calsoft Labs Inc.*, No. 16 CV 7774, 2017 WL 3581162, at *5 (N.D. Ill. Aug. 18, 2017); *Cf. Ultramercial*, 772 F.3d at 716 ("[R]outine additional steps such as . . . restrictions on public access . . . does not transform an otherwise abstract idea into patent-eligible subject matter.").  Claims 27-29 are therefore unpatentable.

In summary, claim 1, the sole independent claim of the '575 patent, is directed an abstract

34

idea at *Alice* Step One and none of its elements, viewed alone or in combination, confer an

inventive concept sufficient for claim 1 to pass muster at *Alice* Step Two.  Further, none of the

claims that depend from claim 1 diminish that claim 1 is directed to an abstract idea or alter the

abstract idea to which claim 1 is directed; as such, each of dependent claims 2-30 fail at *Alice*

Step One for the same reasons as claim 1.  Similarly, none of the elements of the dependent

claims, viewed alone or in combination with those of claim 1, add an inventive concept to the

combination of claim 1 and any dependent claim.  As such, claims 1-30 of the '575 Patent claim

patent-ineligible subject matter under Section 101, and are invalid.

### IV.    CONCLUSION

DriverReach respectfully asks that the Court find that claims of the '575 Patent are

patent-ineligible and dismiss Tenstreet's Complaint for the reasons set forth herein.

Dated:  December 12, 2018

Respectfully submitted,

*/s/ Andrew M. McCoy*
Andrew McCoy (#28297-49)
Louis T. Perry (#25736-49)
andrew.mccoy@faegrebd.com
lous.perry@faegrebd.com
**FAEGRE BAKER DANIELS LLP**
300 N. Meridian St., Suite 2700
Indianapolis, IN  46204
Tel:  (317) 237-0300
Fax:  (317) 237-1000

Leslie B. Hayden
leslie.hayden@faegrebd.com
**FAEGRE BAKER DANIELS LLP**
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO  80203
Tel:  (303) 607-3500
Fax:  (303) 607-3600

***Attorneys for Defendant DriverReach, LLC***