**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| TENSTREET, LLC, an Oklahoma limited liability company, | |
| Plaintiff, | Civil No. 1:18-cv-3633-JRS-TAB |
| vs. | |
| DRIVERREACH, LLC, an Indiana limited liability company, | |
| Defendant. | |

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND ..................................................................................................3

III.  LEGAL STANDARDS .........................................................................................7

    A.   Rule 12(b)(6) Legal Standard ........................................................................7

    B.   35 U.S.C. § 101 Legal Standard ....................................................................7

IV.   ARGUMENT ........................................................................................................9

    A.   Step One:  The Patent Claims are Not Directed to an Abstract Idea .................9

        1.   Under Federal Circuit Precedent, Software Solutions to Specific Technological Problems are Patentable Subject Matter ........................................................................................................9

        2.   The Claims of Tenstreet's '575 Patent are Directed to a Specific Technological Solution for Employee Verifications .............11

        3.   The '575 Patent Does Not Claim an Abstract Method of "Organizing Human Activity" or Storing Data ...................................13

    B.   Step Two:  The Claims Recite an Inventive Concept .......................................17

        1.   The Claims Recite Limitations that are Not Well-Understood, Routine, or Conventional ....................................................................17

    C.   The Dependent Claims are Directed to Patent Eligible Subject Matter...........20

    D.   Dismissal is Not Appropriate..........................................................................21

V.    CONCLUSION.....................................................................................................23

# TABLE OF AUTHORITIES

**Page No(s).**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018)............................................................................... *passim*

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014).............................................................................................. *passim*

*Ancora Techs., Inc. v. HTC Am., Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018)........................................................................................9

*BASCOM Glob. Internet Servs. v. AT&T Mobility*,
   827 F.3d 1341 (Fed. Cir. 2016)..........................................................................8, 17, 19

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)..................................................................................7, 21

*Bilski v. Kappos*,
   561 U.S. 593 (2010).......................................................................................................18

*Content Extraction and Transmission, LLC v. Wells Fargo Bank*,
   776 F.3d 1343 (Fed. Cir. 2014)......................................................................................15

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   880 F.3d 1356 (Fed. Cir. 2018)......................................................................................10

*Credit Acceptance Corp. v. Westlake Services*,
   859 F.3d 1044 (Fed. Cir. 2017)......................................................................................14

*Data Engine Techs. LLC v. Google LLC*,
   906 F.3d 999 (Fed. Cir. 2018)......................................................................................9, 10

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014)...................................................................................7, 10

*Electric Power Group, LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016)......................................................................................15

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016).....................................................................................8, 9

*Erickson v. Pardus*,
   551 U.S. 89 (2007)...........................................................................................................7

## TABLE OF AUTHORITIES
### (Cont'd)

**Page No(s).**

*Foman v. Davis,*
  371 U.S. 178 (1962).................................................................................22

*Interval Licensing LLC v. AOL, Inc.,*
  896 F.3d 1335 (Fed. Cir. 2018).............................................................14

*Mayo Collaborative Servs. v. Prometheus Labs.,*
  566 U.S. 66 (2012)...................................................................................19

*McRO, Inc. v. Bandai Namco Games Am. Inc.,*
  837 F.3d 1299 (Fed. Cir. 2016).................................................... *passim*

*Pierce v Zoetis,*
  818 F.3d 274 (7th Cir. 2016) ....................................................................7

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.,*
  873 F.3d 1364 (Fed. Cir. 2017).............................................................14

*Tamari v. Bache & Co., S.A.L.,*
  838 F.2d 904 (7th Cir. 1988) .................................................................22

*TLI Commc'ns LLC Patent Litig.,*
  823 F.3d 607 (Fed. Cir. 2016)...............................................................14

## OTHER AUTHORITIES

35 U.S.C. § 101.................................................................................. *passim*

Fed. R. Civ. P. 12..................................................................................1, 7

Fed. R. Civ. P. 15.....................................................................................22

Plaintiff Tenstreet, LLC ("Tenstreet") hereby submits this opposition to Defendant DriverReach, LLC's ("DriverReach") Motion to Dismiss. Dkt. No. 14.

## I. <u>INTRODUCTION</u>

The invention claimed in Tenstreet's asserted patent fundamentally changed the technology available for conducting pre-employment verifications for truck drivers. Tenstreet's patent claims a specific technological improvement, an automated peer-to-peer network using multiple available communication channels that, among other things, allows numerous potential employers to request and respond to requests for employment verification information for job applicants by assigning preferred communication channels (e.g., telephone, facsimile, or electronic mail) to the employers, allowing a prospective employer to communicate an employment verification request using the communication channel assigned to the prospective employer, automatically communicating the request to a prior employer using the communication channel assigned to the prior employer, allowing the prior employer to respond to the request by communicating the response using the communication channel assigned to the prior employer, and automatically communicating the response to the prospective employer using the communication channel assigned to the prospective employer. Employers work directly with each other (i.e., in a "peer-to-peer" manner) using Tenstreet's patented software as the network to request and share data that is owned by the employers.

DriverReach seeks to dismiss Tenstreet's Complaint pursuant to Fed. R. Civ. P. 12(b)(6), arguing that the claims of the Tenstreet patent are directed to an abstract idea that is patent ineligible subject matter under 35 U.S.C. § 101. The Federal Circuit, however, has repeatedly held that where, as here, a patent identifies problems with prior technology and claims a specific technological solution, the patent is directed to patent-eligible subject matter, rather than an unpatentable abstract idea. As explained in the asserted patent, before Tenstreet invented its

peer-to-peer network, employers had to separately contact numerous other employers, check computer databases, and repeatedly follow up on requests to comply with employee verification requirements.  Employers received numerous requests through different channels, including fax, telephone, and email, and would respond to the requests through a variety of channels.  As a result, employers had to devote substantial resources to employee verification, and data provided in response to requests was often incomplete or incorrect.  Tenstreet's asserted patent identifies these problems and describes and claims a technological improvement that solves these problems.

DriverReach argues that Tenstreet's claims merely recite the use of conventional computer equipment to automate the "age-old practice of performing pre-employment background checks."  Tenstreet's invention, however, a peer-to-peer employment verification network simply did not exist, and DriverReach has identified no "age-old practice" that Tenstreet adapted.  Thus, Tenstreet's invention required more than simply adding a conventional computer to a standard process.  Tenstreet invented an entirely new automated process.

Patent-eligibility is determined through a two-step analysis.  In step one, courts determine whether a patent's claims are directed to patent ineligible subject matter, such as laws of nature or abstract ideas.  If the claims are directed to patent ineligible subject matter, then the analysis proceeds to step 2.  If not, then the analysis is terminated, and the patent is held to be valid under 35 U.S.C. § 101.  Here, as will be explained in greater detail below, Tenstreet's claims are directed to a technological improvement, rather than an abstract idea.  Thus, this Court should deny DriverReach's motion at step one.

Step two is only necessary if the patent's claims are directed to patent ineligible subject matter.  In step two, a court determines whether the limitations of the claim, individually or in

combination, "transform the nature of the claim into a patent-eligible invention."  The Federal

Circuit has held that where a patent's claims achieve their improvements over conventional

methods in an unconventional manner, or where the claims provide more than simply an

instruction to implement or apply an abstract idea on a computer, the patent contains an inventive

concept.  Because Tenstreet's patent is directed to a technological improvement, and not merely

an abstract idea, it is not necessary to apply step two.  However, even if it were, as will also be

explained in more detail below, Tenstreet's patent claims do achieve their improvements in an

unconventional matter and do more than simply implement or apply an abstract idea on a

computer.  Thus, under both steps one and two, Tenstreet's patent is valid under Section 101, and

this Court should deny DriverReach's motion.

## II.  BACKGROUND

Tenstreet is a technology company that provides software solutions for the transportation

industry.  Tenstreet develops and sells software products, including the Xchange™ employment

verification product, which has enjoyed substantial success and is protected by U.S. Patent No.

8,145,575 ("the '575 patent").  Tenstreet developed the invention described in the '575 patent to

solve problems with conventional technology for conducting pre-employment verifications.

Federal regulations in the commercial trucking industry (as well as other industries)

require employers to complete a thorough verification before hiring a commercial driver.  '575

patent at 1:18-19.  One aspect of this verification process requires contacting all employers from

the three preceding years.  *Id.* at 1:20-21.

At the time of the invention, the conventional method for conducting the mandated

verifications required a prospective employer to contact previous employers one by one, through

"a mix of manual fax processes, incomplete commercial employment history databases, and

phone calls."  '575 patent 1:18-35, 3:33-35.  Truck drivers commonly apply to work for more

than one employer at a time, and employers hire numerous drivers.  Thus, employers were forced to send and receive numerous requests for employment verification through fax, email, and phone calls.  *Id*. at 1:21-24, 3:33-35.  Prospective employers would have to keep track of these requests, follow up if no response was received, and verify information received from databases. Employers providing information would have to provide separate responses to every request, often sending the same information for a single employee many times over, once for each employer requesting the information. Moreover, the conventional technology limited the prior employer's ability to correct information shared with various requesters.  *Id*. at 3:37-40.

The conventional technology also excluded job applicants  from the verification process. Because applicants were excluded by the conventional technology, they were often prevented from exercising their federally mandated rights to protection from the sharing of inaccurate information by providers.  *Id*. at 3:48-51.  In fact, under the conventional system, many applicants did not discover that incorrect information about them was being shared until they had been rejected for a job.  *Id*. at 3:51-54.  The technical limitations of the conventional system thus made preventing and correcting mistakes was extremely difficult.  *Id*. at 1:26-29.

To address these shortcomings, the named inventors developed the invention claimed in the '575 patent.  The '575 patent describes and claims a peer-to-peer network that automates the employment verification process and allows employers to efficiently send and respond to employment verification requests.  *See id*. at 1:39-2:26.

The '575 patent describes a network that encompasses all parties in the verification process—requesters, providers, and applicants.  *Id*. at 2:58-64, claim 1.  The system also includes a central exchange, which is in communication with the network  and manages the interactions of the network members.  *Id*. at claim 1.  The exchange automatically communicates with each

member by that member's preferred assigned communication method, such as communicating directly on the Tenstreet website, but also via fax and email.  *Id*. at 1:48-51, claim 1.  Thus, in contrast to the conventional methods, the claimed invention submits all requests to providers via a single communication channel, making it far easier to  track and respond to requests.  *Id*. at 3:40-41.

The exchange checks each employment verification request to confirm it complies with requirements.  *Id.* at claim 1.  The exchange also handles any follow-up needed.  *Id.* at 3:26-30. Once the provider submits the proper response to the exchange, the response is routed to the requester.  *Id*. at 3:11-29, claim 1.  The provider has the option of storing verification data in a database specific to that provider, and further verification requests can be fulfilled from that database.  *Id.* at 4:35-40.  In addition, a provider can "bulk import[]" verification data to the database if  the provider already has the data in electronic form.  *Id.* at 4:40-45.  In this way, each provider, in effect, has its own database which the provider can then use to fulfill its federally mandated obligations to specific previous employers, thereby accomplishing the "peer-to-peer" function of the '575 patent.  Further, each provider's database can be used to automatically provide the data needed to respond the next request on a particular applicant.  This function significantly reduces the resources providers need to devote to employment verifications, as well as fundamentally improves upon the conventional method.

The '575 patent includes 30 claims, specifically directed to the solution of problems with the conventional technology.  Claim 1 (the only independent claim) provides,

> 1.  A method for peer-to-peer sharing of job applicant verification data over a network, the network comprising; a computerized exchange being in communication with one or more requesters, providers, and job applicants; the exchange managing one or more interactions of each requester, provider and job applicant with the exchange; each requester being an entity seeking verification data about one or more job applicants, each provider being an entity in possession

of the verification data of one or more job applicants and providing the verification data in response to a request for the verification data, the verification data disclosing the status of the job applicant during a period of time; said method comprising the steps of:

allowing one or more communication channels to interface with the exchange;

assigning an attribute to each requester, provider, and job applicant, the attribute defining the communication channel accessible to each requester, provider, and job applicant in transmitting data to the exchange and receiving data from the exchange;

receiving a verification request from a requester through the communication channel of the requester;

comparing, by the computerized exchange, the verification request with requirements;

routing the verification request to a provider through the communication channel of the provider;

receiving verification data provided by the provider in response to the verification request through the communication channel of the provider; and

routing the received verification data through the communication channel of the requester;

wherein at least one requester is also a provider for a second requester and at least one provider is also a requester for a second provider, the at least one requester providing verification data to the exchange for a period of time in which a respective job applicant was employed by at least one requester and the second provider providing verification data to the exchange for a period a time in which the same or a different respective job applicant was employed by the second provider.

'575 patent at 5:42–6:15.  Each of the dependent claims, 2-30, include the limitations of claim 1 and additional limitations.

Defendant DriverReach is a competitor of Tenstreet's.  DriverReach is a relatively new company, founded in 2015 by a former owner of one of Tenstreet's customers.  DriverReach's founder repeatedly used and accessed Tenstreet's patented technology, both prior to forming DriverReach, as well as after forming the competing company.  Rather than develop new technology to compete in the market against Tenstreet, DriverReach's system copied Tenstreet's patented methods.[1]

---

[1] DriverReach's motion to dismiss includes numerous incorrect allegations, including that Tenstreet is attempting to inhibit competition through litigation.  However, these allegations are wholly irrelevant to

## III.  LEGAL STANDARDS

### A.      Rule 12(b)(6) Legal Standard

When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations" contained in the challenged pleadings.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). All reasonable inferences must be drawn in favor of the non-moving party.  *Pierce v Zoetis*, 818 F.3d 274, 277 (7th Cir. 2016). Although, the Federal Circuit has held that patent-eligibility may, in some circumstances, be determined at the 12(b)(6) stage, such a determination is appropriate only if "there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law*." Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).    Where there are disputes, including "[w]hether a particular technology is well-understood, routine, and conventional," resolution as matter of law is inappropriate.  *Berkheimer v. HP, Inc.,* 881 F.3d 1360, 1369 (Fed. Cir. 2018) (reversing grant of summary judgment of invalidity).

### B.      35 U.S.C. § 101 Legal Standard

35 U.S.C. § 101 defines patent-eligible subject matter as any "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." Patents that claim "laws of nature, natural phenomena, and abstract ideas—or add too little to such underlying ineligible subject matter" do not claim patentable subject matter under Section 101.  *DDR Holdings, LLC v. Hotels.com, L.P*., 773 F.3d 1245, 1255 (Fed. Cir. 2014).   In order to determine whether a claim complies with Section 101, the Supreme Court has directed courts to perform a two part analysis.  This analysis asks, (1) whether the claim, as a whole, is "directed to" patent-ineligible subject matter and, (2) if so, whether the elements of the claim, considered

---

DriverReach's motion to dismiss.  Moreover, Tenstreet denies each and every such allegation and will respond to them in detail in the appropriate forum.

individually or as an ordered combination, "transform the nature of the claim into a patent-eligible application." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014) (internal quotations omitted).

As the Supreme Court clarified, "an invention is not rendered ineligible for patent simply because it involves an abstract concept," acknowledging that, "[a]t some level, all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 573 U.S. at 217 (internal quotation marks and citation omitted). Thus, even if a claim is directed to an abstract idea, it is still patent-eligible if the claimed invention transforms the abstract idea into something patentable. *Alice,* 573 U.S. at 221.  Technical improvements over prior art methods of performing a known concept, particularly where such improvements are achieved through the use of a particular arrangement of elements, transform the abstract idea into patent-eligible subject matter.  *See BASCOM Glob. Internet Servs. v. AT&T Mobility,* 827 F.3d 1341, 1349-50, 1352 (Fed. Cir. 2016); *see also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016).

In its motion, DriverReach suggests that a claim must include specialized computer hardware or other specialized equipment to be patentable under Section 101.  *See* Mot. at 19. This is incorrect.  In *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016), for example, the Federal Circuit confirmed that claims directed to computer software are ***not*** inherently abstract and may be patentable subject matter.  "Software can make non-abstract improvements to computer technology just as hardware improvements can, and sometimes the improvements can be accomplished through either route."  *Id.*  In cases involving software innovations, the inquiry often turns on whether the claims focus on a specific asserted improvement in capabilities or whether the process is an abstract idea for which computers are

invoked merely as a tool.  *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1347 (Fed. Cir. 2018); *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007-08 (Fed. Cir. 2018).    In making this determination, courts read the claims in light of the specification.  *Enfish*, 822 F.3d at 1335.

## IV.  <u>ARGUMENT</u>

### A.    <u>Step One:  The Patent Claims are Not Directed to an Abstract Idea</u>

The claims of the '575 patent are eligible for protection under Section 101 because they are directed to a specific technological advance over the conventional methods and systems for performing pre-employment verifications—not an abstract idea.

#### 1.    <u>Under Federal Circuit Precedent, Software Solutions to Specific Technological Problems are Patentable Subject Matter</u>

The Federal Circuit has repeatedly found that, where a specification identifies problems in an existing technological system and discloses a specific technological solution to those problems (including software solutions), the focus of the claimed invention is not an abstract idea and is patentable subject matter.  For example, in *Enfish*, the patent identified problems with conventional databases and claimed a "self-referential table" that solved those problems and "achieve[d] other benefits over conventional databases."  *Enfish*, 822 F.3d at 1336-37, 1331-33. The Federal Circuit held that the claims were patentable subject matter because they were directed to a specific solution to existing technological problems.  *Id*. at 1339.

Similarly, in *Data Engine*, decided by the Federal Circuit in 2018, the patent identified problems with user interfaces for conventional spreadsheets and disclosed a solution—the use of notebook-like tabs for navigation within a spreadsheet.  *Data Engine*, 906 F.3d at 1008.  The Federal Circuit rejected the argument that the claims were invalid because they were directed to an abstract idea (the use of notebook-like tabs for spreadsheets).  Instead, the court held that the

claims were directed to a "technical solution and improvement in electronic spreadsheet functionality" and therefore were patentable. *Id*. at 1012.

In *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc*., 880 F.3d 1356, 1363 (Fed. Cir. 2018), the Federal Circuit held that a patent claiming software for displaying an improved menu interface on a screen was patentable subject matter and rejected the argument that the patent was directed to an abstract idea of an index. *Id.* at 1359. The Federal Circuit explained that the claims were not directed to an abstract idea because they "recite a specific improvement over prior systems, resulting in an improved user interface for electronic devices." *Id.* at 1363.

In *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), the patents-in-suit described a problem with systems for generating a web page: a third party advertisement could lure a visitor away from the host's web page. The claims recited a system that, (a) stored visual elements corresponding to a host's website in a database, (b) on activation of a link by a visitor identified the host, and (c) instructed an Internet web server of a third party to display a hybrid web page that merged content of the third-party merchant with the visual elements of the identified host's webpage. *Id.* at 1258. Again, the Federal Circuit held that the claims were directed to patentable subject matter "because they do not broadly and generically claim 'use of the Internet' to perform an abstract business practice (with insignificant added activity)" but instead, "specify how interactions with the Internet are manipulated to yield a desired result . . ." *Id.* at 1258-59.[2]

Finally, in *McRO*, the Federal Circuit held that a claimed invention that automated, on a computer, a process conventionally performed by humans was patentable subject matter. The patent's specification described the claimed improvement to be "'accurate and realistic lip

---

[2] The Federal Circuit did not clearly determine whether the *DDR Holdings* patent was directed to patentable subject matter under step one of the *Alice* test, but held that without a doubt it is patentable subject matter under step two.

synchronization and facial expressions in animated characters' that previously could only be produced by human animators" accomplished by using a set of rules rather than human artists. *McRO*, 837 F.3d at 1313.  The Federal Circuit expressly recognized that processes that automate tasks that humans are capable of performing can be patent eligible.  *Id*.  Because specific features of the rules were included in claim limitations, the Federal Circuit held that the patentee had properly limited the claims to eligible subject matter.  *Id*. at 1316.

> 2.     **The Claims of Tenstreet's '575 Patent are Directed to a Specific Technological Solution for Employee Verifications**

Here, the invention claimed in Tenstreet's '575 patent solves a specific technological problem: the inefficient, costly, time-consuming, and error-prone process of completing pre-employment verifications.  As explained in the specification, regulations require prospective employers to contact each of an employee's previous employers for the past three years.  Before Tenstreet's invention, this task was accomplished through "a mix of manual fax processes, incomplete commercial employment history databases, and phone calls."  '575 patent at 1:18-35.  This resulted in "a time consuming, expensive process for the carrier."  *Id*.  It also resulted in "mistakes in information from previous employers" that were difficult for an applicant to identify and correct.  *Id*.

Tenstreet's '575 patent describes a specific solution to this technological problem.  The invention of the '575 patent, (1) automates the process, (2) allows providers to receive requests through a single communication channel, and (3) allows applicants to review exchanged data in real time and request corrections of previous employment information.  Claim 1 is directed to "peer-to-peer sharing of job applicant verification data" across a network of employers (referred to in the patent as an "exchange").  Far from claiming an abstract idea, Claim 1 specifically describes requirements for the network, including "defining the communication channel" (fax,

email, website, etc.) for each entity requesting or providing employee verification data in the network; "receiving a verification request" from an entity seeking verification data; "comparing . . . the verification request with requirements;" routing the request to another entity in the network through its preferred communication channel and receiving a response with verification data from that entity; and routing the response back to the entity that requested the data.  Claim 1 further specifies that at least one entity requesting data is also providing data for another requester, and at least one entity providing data is also requesting data.

Tenstreet's network allowing peer-to-peer sharing revolutionized the employee verification process.  Through the network, a prospective employer can send out multiple verification requests to an applicant's numerous previous employers via each previous employers' preferred method of providing the information.  A previous employer can receive all verification requests through the same channel and can save information for a particular applicant on the network, making responding to requests far less burdensome.  '575 patent at 4:35-45.  Before Tenstreet's invention, a peer-to-peer network as claimed in the '575 patent did not exist—the best available technology was a traditional database (which often contained out-of-date information) and required prospective employers to seek verification from numerous different sources.  Tenstreet's claimed network, thus, does not simply add a computer to an old or "generic" process.  *See* Mot. at 1, 19.

DriverReach incorrectly asserts that the "computerized exchange" claimed in the '575 patent is a generic computer network.  Mot. at 22.  In fact, as explained in the specification of the '575 patent, the "network" and "computerized exchange" referred to in the patent are not a generic computer network.  Rather, the "network" refers to a network of employers connected by

the "exchange," which manages interactions between the members of the network, and automates the method through the application of certain claimed rules.  *See* '575 patent at claim 1.  Prior to Tenstreet's invention, no such employer network existed.  As with the invention in *McRO*,  the '575 patent claims do more than simply  automate human activity through the use of a conventional computer; they automate pre-employment verifications by using a computerized exchange that applies specific rules to accomplish improved pre-employment verifications in a manner that conventional technology was unable to do.  Indeed, it constitutes the specific and substantial technological advance and improvement over conventional methods that courts have consistently found to be patentable subject matter.

### 3.    The '575 Patent Does Not Claim an Abstract Method of "Organizing Human Activity" or Storing Data

DriverReach incorrectly asserts that the invention of the '575 patent is directed to an abstract method of organizing human activity that uses a generic computer to store data.  Mot. at 18.  DriverReach cites a number of cases involving "organizing human activity" and storing data.  However, those cases are inapposite.  None of the cases cited by DriverReach involved a patent directed to a solution to a specific technological problem or a fundamental change in technology such as that claimed in the '575 patent.

For example, in *Alice* the patent described a concept called "intermediated settlement" that was known and used long before the patent.  The Supreme Court in *Alice* determined that the claims at issue "simply instruct[ed] the practitioner to implement the abstract idea of intermediated settlement on a generic computer." *Alice,* 573 U.S. at 225.  Here, in contrast, the invention of the '575 patent fundamentally changed the technology available for performing employment verifications by providing an automated peer-to-peer network, since a peer-to-peer

network for completing employment verifications was previously unknown.  Thus, the invention of the '575 patent is a technological improvement—not merely the use of a computer to carry out a well-known algorithm or abstract idea, as in *Alice* or the other cases cited by DriverReach.

The cases cited by DriverReach concern patents that broadly claim a result without describing any technological solution.  In *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1338 (Fed. Cir. 2018), the claims were directed to the operation of an "attention manager" that makes use of unused capacity of a display device by displaying additional content.  The patent, however, offered "no clues on how the 'attention manager'" accomplished this.  In holding that the claims covered unpatentable subject matter, the Federal Circuit explained that software-based inventions are unpatentable subject matter when the claims merely recite a "desired result . . . without any limitation on how to produce that result.  Instead of claiming a solution for producing that result, the claim in effect encompasses all solutions."  *Id.* at 1345.

Similarly, in *TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016), the patent broadly attempted to claim the idea of storing digital images on a server and manually or automatically assigning "classification data," such as a date or timestamp to the images.  *Id.* at 610.  Nothing in the patent disclosed any specific improvement to technology or computer functionality.  In *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1372 (Fed. Cir. 2017), the claims were simply directed to the broad concept of paying a subway fare using a credit card.  In *Credit Acceptance Corp. v. Westlake Services*, 859 F.3d 1044, 1054 (Fed. Cir. 2017), the claims were directed to the abstract idea of "processing an application for financing a purchase."

In *Content Extraction and Transmission, LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1345 (Fed. Cir. 2014), the patent at issue claimed a method for scanning and storing documents that included the steps of "(a) receiving output representing . . . hard copy documents . . . and storing information" from the documents via an "automated digitizing unit"; (b) recognizing portions of said hard copy documents; and (c) storing information.   The patentee conceded that the "automated digitizing unit" was simply a conventional scanner, well-known at the time of filing. In *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016), the claims were also directed to a desired result of collecting information and analyzing it.   The claims did not require "a new source or type of information, or new techniques for analyzing it."   *Id.* at 1355.

In contrast, Tenstreet's '575 patent claims a specific technological solution for the problems with the prior art methods of manually conducting employee verifications by contacting employers and searching databases.   Tenstreet's claims specifically describe Tenstreet's automated peer-to-peer network technology.

Moreover, like the invention in *McRO*, for the invention claimed in the '575 patent, it is the incorporation of specific rules and interactions—not the use of the computer—that improved the existing technological process by allowing automation of tasks, focusing communication within assigned preferred channels, and allowing real-time review of data by the applicants. *McRO,* 837 F.3d at 1314.   Specifically, an attribute is assigned to a requester, provider, and applicant, defining the accessible communication channel for each of them.   '575 patent at claim 1.   Verification requests are compared with requirements, and based on attributes assigned to specific providers, the request is routed though the proper communication channel to the

provider.  *Id*.   Responses to verification requests are routed through the appropriate communication channel.  *Id*.  As another example, routing of data, as well as access to portions of the exchange, are controlled by the assigned attribute.  *See id*. at claims 1, 7, 14.  In addition, the requirements direct the next step performed by the exchange, for example obtaining authorization or refusal of authorization for verification (claims 10 and 12), obtaining a digital signature (claims 11 and 13), directing the verification data to the applicant (claim 15), and holding the verification data (claim 16).  This is in stark contrast to *Alice*, where the claimed computer-automated process and the conventional method were carried out in the same way.

DriverReach's assertion that the '575 patent attempts to preempt all uses of a patent-ineligible idea is also incorrect.  As the Federal Circuit recently explained, the preemption concern, "prevent[s] patenting of claims that abstractly cover results where 'it matters not by what process or machinery the result is accomplished.'"  *McRO*, 837 F.3d at 1314 (citation omitted).  The claims of the '575 patent do not do this.   To the contrary, the specific structure of the claims prevents broad preemption of all means of automating pre-employment verifications.  For example, claim 1 requires the system to have a network comprised of certain members, requires a "computerized exchange" with specific capabilities, and requires that unique attributes be assigned to each network member to define the communication channels accessible to them.  '575 patent at claim 1.  Moreover, DriverReach has not shown, or even attempted to explain, how any automated process must use the particular rules claimed in the '575 patent.  *See McRO*, 837 F.3d at 1315.  Thus, claim 1 does not preempt all pre-employment verification process— only the specifically claimed method.

Accordingly, the '575 patent describes existing pre-employment verification technology, identifies problems therewith, and discloses a specific technological solution that solves those

problems.  Moreover, the '575 patent claims precisely claim the described solutions.  Thus, the '575 patent is focused on a specific improvement in pre-employment verification technology.  The patent is therefore patent-eligible at step one, and it is unnecessary even to analyze the patent under step two.

**B.**     **Step Two:  The Claims Recite an Inventive Concept**

Under step two of the *Alice* framework for determining patent eligibility, patent claims directed to a patent-ineligible concept are nonetheless patentable if additional elements in the claims transform the nature of the claim into a patent-eligible application.  *BASCOM*, 827 F.3d at 1348.  Step two of the eligibility analysis "is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry."  *Aatrix*, 882 F.3d at 1128 (internal quotation marks and citation omitted).  Here, the claims of the '575 patent are not directed to an abstract idea, and thus, cover patentable subject matter.  However, even if the Court were to find the '575 patent ineligible under step one of the *Alice* test, the claims would still be patentable under the second part of the *Alice* test.  Here, considering the claim elements "both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application," leads to one conclusion: the claims recite an inventive concept.  *Alice,* 573 U.S. at 217.

**1.**     **The Claims Recite Limitations that are Not Well-Understood, Routine, or Conventional**

To achieve technological improvements over the conventional methods for performing pre-employment verifications, the claims make use of a specific network (including requesters, providers, and applicants), a computerized exchange (in communication with network members and capable of managing network interactions), communication channels that interface with the

exchange, attributes assigned to each network member that define the accessible communication channels, and particular rules that serve to automate the process of performing pre-employment verifications.

The recited combination of elements was unconventional at the time of the invention. Indeed, as the specification explains in detail, conventional methods were not capable of allowing the applicant to participate in the exchange of data in real time. *See* '575 patent at 1:26-29 ("For the driver . . . preventing and correcting mistakes is very difficult to accomplish."); 3:48-54 ("While a driver 36 currently has a number of protections under FCRA and DOT regulations against inaccurate data being shared with prospective employers, the practical reality is that it is often difficult to utilize those protections.  In many cases, [the] driver 36 must first experience being turned down for a job and discover well after that incorrect information is the cause.").   In addition, under the conventional practice, providers were required to manage requests from a number of channels (fax, telephone, online, etc.).  '575 patent at 3:33-35.

Like the invention in *McRO*, the automation here goes beyond merely "organizing [existing] information into a new form" or carrying out a fundamental economic practice. *McRO*, 837 F.3d at 1315. The claimed method uses a combined order of specific rules that renders information into a specific format that is then used and applied to create desired results: an information exchange wherein requests and responses are automatically routed, providers receive requests through a single communication channel, and applicants have an avenue to review and request correction of data.  While the result may not be tangible, there is nothing that requires a method "be tied to a machine or to transform an article" to be patentable. *Bilski v. Kappos*, 561 U.S. 593, 603 (2010).  Rather, the concern underlying the exceptions to Section 101

is not tangibility, but whether the claims monopolize an abstract idea.  *Mayo Collaborative Servs. v. Prometheus Labs.*, 566 U.S. 66, 84-85 (2012).

As explained in the patent's specification, and as is apparent from the claim limitations, both individually and as an ordered combination, the claimed invention departed from the standard industry practice by developing an automated method of performing pre-employment verifications through technology-based improvements: creating a channel for applicants to review and correct data and implementing a specific set of rules by which such verifications are automated.  Moreover, the claims create a system to limit communications with a given provider to a specific communication channel.  *See* '575 patent at claim 1 (assigning network members attributes defining the accessible communication channel); 3:40-43 ("[w]ith [the] exchange, all requests for a provider would be managed through one channel").

In sum, the claim limitations are individually, and as an ordered combination, unconventional.  Accordingly, the claims involve "more than performance of well-understood, routine, and conventional activities previously known to the industry" and are therefore directed to patent-eligible subject matter under step two of the analysis.  *See Aatrix*, 882 F.3d at 1128, *BASCOM*, 827 F.3d at 1349.

DriverReach incorrectly asserts that the claims of the '575 patent fail to satisfy step two because they merely recite the use of standard computer and communications equipment to perform generic tasks.  DriverReach's analysis conveniently ignores fundamental, technological differences between the conventional and the claimed methods—the ability of the applicant to monitor and correct data, the ability of the provider to receive all requests in a single communication channel, and the automation of pre-employment verifications.  *See* '575 patent at 5:28-31, 3:28-35.

As explained in detail above, the claims are directed to technological improvements allowing for the automation of pre-employment background checks by implementing specific rules in a computerized exchange.  Thus, unlike the cases relied on by DriverReach, in the '575 patent, it is not the incorporation of the computer, but rather the claimed rules that improve the existing technological process.  *Id.*; Mot. at 23.

Moreover, although DriverReach makes much of the fact that the claimed method increases efficiency and accuracy, such a benefit is hardly the death knell of a claim.  *McRO*, for example, also increased efficiency and accuracy by automating an activity previously performed by humans.  *McRO*, 837 F.3d at 1306-7.  Patented inventions routinely increase efficiency and accuracy.

Nor does the mere fact that humans previously could have performed pre-employment verifications by manually operating conventional technology mean that there is no inventive concept.  *See McRO*, 837 F.3d at 1313.  Like *McRO*, the claims automate the process of pre-employment verifications not by automating human activity, but by using rules, rather than humans, to evaluate and perform verifications.  *Id*.

Accordingly, DriverReach's arguments fail to establish that the elements of the claims, alone or as an ordered combination do not transform an abstract idea into patent-eligible subject matter.

## C.   The Dependent Claims are Directed to Patent Eligible Subject Matter

As explained in sections A and B above, the claims, including claim 1, are directed to patent eligible subject matter.  Claims 2-30, which depend, directly or indirectly, from claim 1 are also, for the same reasons, directed to patentable subject matter.  Moreover, the dependent claims further implement specific additional rules which automate and improve the employment verification methods.  For example, the dependent claims include rules that the computerized

exchange applies in order to obtain authorization, or refusal of authorization, for verification (claims 10 and 12), obtain a digital signature (claims 11 and 13), direct the verification data to the applicant (claim 15) and hold the verification data (claim 16).

## D.      Dismissal is Not Appropriate

DriverReach's motion to dismiss should also be denied because resolution at the pleadings stage is not appropriate.  The '575 patent includes facts which, if taken as true, prevent resolving the eligibility question as a matter of law.  "Whether the claim elements or the claimed combinations are well-understood, routine, conventional is a question of fact."  *Aatrix*, 882 F.3d at 1128.  Dismissal under Section 101 at the pleadings stage is warranted "***only*** when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law."  *Id*. at 1125 (emphasis added); *see Berkheimer*, 881 F.3d at 1369 (reversing grant of summary judgment of invalidity under Section 101).

Further, DriverReach cannot meet the burden necessary for dismissal.  To carry its step two burden, DriverReach would have to show that the claims of the '575 patent involve nothing more than the performance of well-understood, routine, or conventional activity.  And it would have to do so "based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice."  *Aatrix*. at 1128.  This Court should deny DriverReach's motion if there is a genuine factual dispute that the individual elements and claimed combinations are not well-understood, routine or conventional activity.

Contrary to DriverReach's arguments, the '575 patent, which this Court should consider on this motion, raises issues of genuine fact.  For example, the '575 patent includes statements disclosing that, at the time of the invention it was conventional for, (1) applicants to be excluded from the data exchange, and (2) providers to receive requests from numerous communication channels.  *See* '575 patent at 3:33-40; 3:48-55.  Moreover, the '575 patent discloses specific rules

for accomplishing these goals, in addition to automating the employment verification process. *See, e.g., id*. at claims 1, 7, 14-17.  Accepting these statements as true prevents resolution of the eligibility questions as a matter of law because there is a genuine factual dispute as to whether technical improvements creating avenues to include applicants in the data exchange and for providing a network to receive requests from a single communication channel were well-understood, routine, or conventional activities in the industry.

Alternatively, if the Court were to require that Tenstreet plead such facts in its Complaint, rather than rely on the facts set forth in the '575 patent attached to the Complaint, Tenstreet requests leave to file an amended complaint.  Courts should freely grant leave to amend when justice so requires.  Fed. R. Civ. P. 15(a)(2).  Although leave to amend need not be granted automatically, it should be freely given if the underlying facts relied on by the plaintiff may be a proper subject of relief.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  In deciding whether or not to grant leave, courts may consider futility, undue delay, bad faith, undue prejudice and burden on the court.  *See id.; Tamari v. Bache & Co., S.A.L.*, 838 F.2d 904, 909 (7th Cir. 1988).

Here, Tenstreet's proposed amended complaint would recite key limitations from the patent claims and the specification and allege that the particular combination of requirements and components not part of conventional practice.  Moreover, the proposed amended complaint would include factual allegations supporting this conclusion, including allegations that, at the time of the invention it was conventional for, (1) applicants to be excluded from the data exchange, and (2) providers to receive requests from numerous communication channels.

In addition, as the Federal Circuit explained in *Aatrix*, allowing a party to amend a complaint to allege facts which "at a minimum raise factual disputes underlying the § 101 analysis" sufficient to survive the eligibility analysis at the 12(b)(6) stage, would not be futile.

*Id*. at 1126.  Moreover, as the case is in the earliest stages, DriverReach would not be prejudiced by the filing of the amended complaint, nor would this Court be burdened by allowing proposed amendments.

Accordingly, DriverReach's motion to dismiss should be denied, or alternatively, Tenstreet should be granted leave to file an amended complaint.

## V.  <u>CONCLUSION</u>

Because the '575 patent is not invalid under Section 101, this Court should deny DriverReach's motion.

Respectfully submitted,

Dated:  <u>January 9, 2019</u>

 <u>/s/ *Michael K. Friedland*   </u>
James W. Riley, Jr. (No. 6073-49)
RILEY BENNETT EGLOFF LLP
141 East Washington Street, Fourth Floor
Indianapolis, IN 46204
Telephone: (317) 636-8000
Facsimile: (317) 636-8027
jriley@rbelaw.com

Michael K. Friedland (*pro hac vice*)
Lauren Keller Katzenellenbogen (*pro hac vice*)
Karen M. Cassidy (*pro hac vice*)
KNOBBE, MARTENS, OLSON &BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502
michael.friedland@knobbe.com
lauren.katzenellenbogen@knobbe.com
karen.cassidy@knobbe.com

*Attorneys for Plaintiff Tenstreet, LLC*