UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TENSTREET, LLC, an Oklahoma limited liability company, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:18-cv-03633-JRS-TAB |
| DRIVERREACH, LLC, an Indiana limited liability company, | ) ) ) ) | |
| Defendant. | ) ) | |

**Order on Motion to Dismiss (ECF No. 14)**

Defendant DriverReach, LLC moves to dismiss Plaintiff Tenstreet, LLC's complaint for failure to state a claim upon which relief can be granted. (ECF No. 14.) The motion, now fully briefed and ripe for decision is **granted** for the following reasons.

## I. Background[1]

Plaintiff Tenstreet, LLC ("Tenstreet") develops and sells software products and services for the transportation industry. (Compl. ¶ 7, ECF No. 1.) One such product, Xchange™, is a network that facilitates the sharing of job applicant verification data between past and prospective employers of commercial truck drivers. (*Id*.) Tenstreet acquired a patent for Xchange™ on March 27, 2012, U.S. Patent No. 8,145,575 (the

---

[1] Consistent with the Rule 12(b)(6) standard, Plaintiff's non-conclusory allegations are taken as true for purposes of Tenstreet's motion to dismiss.

1

"'575 patent"), entitled "Peer to Peer Sharing of Job Applicant Information." (Compl. ¶ 8, ECF No. 1.)

The '575 patent explains that federal regulations require employers of commercial truck drivers to complete a verification process before hiring a driver. ('575 Patent, ECF No. 1-1 at 1:18-20.) Part of this process involves verifying the driver's employment history from the preceding three years. (*Id.* at 1:20-21.) Before Tenstreet's product, Xchange™, was created, employers would verify this data by contacting the driver's previous employer via fax, phone, or through a commercial employment history database. (*Id.* at 1:21-24.) The '575 patent alleges that this method was "time consuming" and "expensive" for the employers and often resulted in errors that drivers were unable to correct. (*Id.* at 1:25-29.)

Xchange™ sought to streamline this process by creating a "method for peer-to-peer sharing of job applicant data over a network." (*Id.* at 5:42-43.) Claim 1 of the '575 patent is representative and dispositive of the asserted claims.[2] It describes the

---

[2] Tenstreet asserts "at least Claim 1" of the '575 patent. (Pl.'s Br. ¶ 16. ECF No. 1.) Claim 1 is independent and claims 2-30 are dependent. ('575 Patent, ECF No. 1-1 at 5:42-8:18.) The added limitations of the dependent claims do not affect the result of the patentability of the '575 patent. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1307 n.3 (Fed. Cir. 2016). The Federal Circuit has held that addressing each claim is unnecessary when "all the claims are substantially similar and linked to the same abstract idea," *Content Extraction & Transmission, LLC v. Wells Fargo Bank, Nat'l. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014), despite Supreme Court language suggesting otherwise, *Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*, 573 U.S. 208, 217 (2014) ("[We] consider the elements of each claim both individually and as an ordered combination to determine whether the additional element transform the nature of the claim into a patent-eligible application.") (internal quotations and citations omitted). Nonetheless, Tenstreet does not present any meaningful argument for the distinctive significance of the dependent claims. (Pl.'s Br., ECF No. 24 at 24.); *Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016).

network as a "computerized central exchange that interfaces with requesters, providers, and job applicants." (*Id.* at 1:40-42.) Requesters are prospective employers who seek verification data about a job applicant. (*Id.* at 1:42-44.) Providers are former employers who possess the verification data of a job applicant. (*Id.* at 1:44-46.) The exchange manages the interactions of each participant by providing access to a communication channel depending on the classification of the requester, provider, or job applicant seeking access to the exchange. (*Id.* at 1:48-51.) The communication channel may be an online interface, a facsimile interface, or an electronically stored data interface. (*Id.* at 1:52-54.)

Typically, the exchange will receive a request from a prospective employer, a requester, to verify the employment data of a job applicant. (*Id.* at 1:58-60.) The job applicant must then authorize this verification. (*Id.* at 1:60-61.) Next, the request is routed to the past employer, the provider, through the communication channel of that provider. (*Id.* at 1:63-65.) The provider then submits the verification data to the exchange, which then routes the completed verification data to the requester. (*Id.* at 1:66-67; 2:1.)

Additionally, job applicants and providers can store the verification data in a centralized database to complete subsequent requests. (*Id.* at 2:11-13.) Requesters, providers, and job applicants may check the status of a verification transaction with the exchange. (*Id.* at 2:16-18.)

The '575 patent alleges that this network improves upon the previous verification process by managing "the complexity associated with different parties participating

3

in different ways with the network so that individual partners do not have to manage it for themselves." (*Id.* at 2:64-67.) Moreover, the patent claims that the software provides additional protections for drivers against inaccurate data being shared with prospective employers, beyond what the regulations provide. (*Id.* at 3:56-63.) By using Xchange™, drivers can review and correct information before it is sent to the prospective employer. (*Id.* at 2:7-10.)

Tenstreet alleges that Defendant DriverReach, LLC ("DriverReach") has infringed the '575 patent by selling its own employment verification product, VOE Plus Solutions. (Compl. ¶ 2, ECF No. 1.) DriverReach has moved to dismiss on the ground that the '575 patent is patent-ineligible subject matter under 35 U.S.C. § 101. (Def.'s Motion to Dismiss, ECF No. 14.)

## II. Legal Standard

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In considering a Rule 12(b)(6) motion to dismiss, the court takes the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019). The court need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In addition to the allegations in the complaint, on a motion to dismiss, the court may consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject

to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.'" *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) (quoting *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002)). Thus, the court may consider such a document "without converting a motion to dismiss into a motion for summary judgment." *Id.* at 891–92.

"[I]f a plaintiff pleads facts that show its suit [is] barred . . . , it may plead itself out of court under a Rule 12(b)(6) analysis." *Orgone Capital*, 912 F.3d at 1044 (quoting *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995)); *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (quoting *Hamilton v. O'Leary,* 976 F.2d 341, 343 (7th Cir. 1992)) (on a motion to dismiss "district courts are free to consider 'any facts set forth in the complaint that undermine the plaintiff's claim'"). "When a complaint fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity . . . to amend the complaint to correct the problem if possible." *Bogie*, 705 F.3d at 608. Nonetheless, leave to amend need not be given if the amended pleading would be futile. *Id.*; *see also Foman v. Davis,* 371 U.S. 178, 182 (1962).

A Rule 12(b)(6) motion to dismiss is a proper vehicle to determine patent eligibility under 35 U.S.C. § 101. *Generic Techs. Ltd. v. Merial L.L.C.,* 818 F.3d 1369, 1373-74 (Fed. Cir. 2016). Claim construction is not required prior to conducting a § 101 analysis when it is apparent from the patent that the asserted claims are not directed to

eligible subject matter. *Id.* at 1374; *see also Content Extraction*, 776 F.3d at 1349 ("Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101." *Content Extraction*, 776 F.3d at 1349.) However, plausible factual allegations may preclude dismissal of a case where "nothing on the record . . . refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)." *Bascom Global Internet Sers., Inc. v. AT&T Mobility LLC*, 827 F.3d at 1341, at 1352 (2016).

### III. Discussion

35 U.S.C. § 101 defines patentable subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." The Supreme Court, however, "has long held that this provision contains an important implicit exception[:] Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics*, Inc., 569 U.S. 576, 589 (2013) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012)). This case involves the abstract idea exception.

The Supreme Court has set forth a two-step analytical framework to identify patents that claim abstract ideas. *Alice,* 573 U.S. at 217. The first inquiry asks "whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* (citing *Mayo*, 566 U.S. at 77-78). If this threshold determination is met, the next step is to "search for an 'inventive concept' –i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly

6

more than a patent upon the [ineligible concept] itself.'" *Id.* at 217-18 (quoting *Mayo*, 566 U.S. at 72-73). This second step requires consideration of "the elements of each claim both individually and 'as an ordered combination' to determine whether additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* at 217 (quoting *Mayo*, 566 U.S. at 79, 78).

The Court cautioned that it must "tread carefully" in construing the exceptions to § 101 "lest it swallow all of patent law." *Id.* (citing *Mayo*, 566 U.S. at 71). However, laws of "abstract ideas are the basic tools of scientific work," and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Id.* at 216 (internal quotations and citations omitted). Thus, in applying the § 101 exception, courts must "distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more." *Id.* at 217 (quoting *Mayo*, 566 U.S. at 89).

Construing the claim elements in the light most favorable to Tenstreet, the Court finds that the claims are directed to the abstract idea of collecting, organizing, and storing data on a generic computer and fail to add an inventive concept sufficient to transform the abstract idea into patent-eligible subject matter.

A. *Alice Step One*

The '575 patent purports to advance a technological solution to the cumbersome employment verification process by providing a "peer-to-peer" network for employers and job applicants to communicate and share data. ('575 Patent, ECF No. 1-1 at 1:39-40.) But this claimed invention is nothing more than "an abstract idea implemented

7

on a computer." *FairWarning IP, LLC v. Iatric Sys., Inc*, 839 F.3d 1089, 1095 (Fed. Cir. 2016). The '575 patent asserts no inventive technology being used to perform the verification process, rather, it is carried out using a generic computer exchange and network. ('575 Patent, ECF No. 1-1 at 1:42-45.) *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("distinguishing between computer-functionality improvements" and "uses of existing computers as tools in aid of processes focused on abstract ideas.").

The '575 patent is a "quintessential do it on a computer patent." *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2018). Employment data that was previously collected and stored by humans via phone, fax, or a database is now collected by a computer using the same communication tools. "The fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter." *FairWarning* 839, F.3d at 1095 (quoting *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012)). Although the Xchange™ software saves time and reduces errors, that is the result of using a general-purpose computer, not the patented method itself. *See id.* (citing *Bancorp,* 687 F.3d at 1278).

The Federal Circuit has repeatedly found similar claims to be within the realm of abstract ideas. *See, e.g.*, *Univ. of Fla.*, 916 F.3d at 1368 (declaring patent-ineligible a system that automated the manual collection and manipulation of hospital data onto a computer); *FairWarning*, 839 F.3d at 1094 (holding that the computerized monitoring and analyzing of data for the purpose of detecting fraud was merely an abstract

8

idea implemented in a new environment); *Elec. Power*, 830 F.3d at 1354 (finding a method of detecting and analyzing events on an electric power grid, with no inventive technology used to perform the functions, was an abstract idea using computers as tools); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (holding that the taking, transmitting, and organizing of digital images based on their individual classifications, carried out on a generic telephone and computer, is an abstract idea.)

Tenstreet attempts to distinguish *TLI Commc'ns* by arguing that, unlike the '575 patent, nothing in TLI's patent "disclosed any specific improvement to technology or computer functionality." (Pl.'s Br. ECF No. 24 at 18.) According to Tenstreet, the '575 patent "improved the existing technological process [of employment verification] by . . . automating tasks, focusing communication within assigned preferred channels, and allowing real-time review of data by the applicants." (*Id.* at 19.) But the so called "existing technological process" was not a network that the '575 inventors improved upon; they merely automated human tasks onto a computer. And the computer the '575 patent requires to carry out its claim is described as a "central exchange," capable of managing interactions between participants, classifying each participant, and routing and storing data, all functions that a generic computer is already able to perform. ('575 Patent, ECF No. 1-1 at 1:42-67.) *See TLI*, 823 F.3d at 612 ("[T]he server is described simply in terms of performing generic computer functions such as storing, receiving, and extracting data.")

The cases Tenstreet cites in support of its position are distinguishable. Tenstreet seeks to equate its '575 patent to the patent in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (2016). In *Enfish*, the patent claimed a new "self-referential table" for computer databases that had increased flexibility, faster search times, and smaller memory requirements than conventional databases. *Enfish*, 822 F.3d at 1337. The claims did not "simply add . . . conventional computer components to well-known business practices" they improved "how computers could carry out one of their basic functions of storage and retrieval of data." *Id.* at 1338, 1336. In contrast, the '575 patent makes no improvement to the already existing computer functions, and merely implements a business practice onto a computer.

Tenstreet also incorrectly analogizes to *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016), which held patent-eligible an invention that transformed a subjective art process performed by humans into a mathematically automated process with specific, limited rules. The patent in *McRO* "allow[ed] computers to produce accurate and realistic lip synchronization and facial expressions in animated characters that previously could only be produced by human animators." *Id.* (internal quotations omitted). Unlike Tenstreet, McRO did not simply automate a human process onto a generic computer. *Id.* at 1314. McRO improved the existing computer by enabling it to perform the subjective art process of animation. *Id.* What further distinguishes the patent in *McRO* from the '575 patent is that McRO claimed a *means or method* of producing a certain result, rather than just the result. *Id.* (emphasis added). It was the incorporation of the claimed rules

10

in McRO's patent, not the use of the computer, that improved the existing process by replacing a human artist's judgment with specific mathematical rules. *Id*. The '575 patent, in contrast, creates no new means or method of collecting and storing data, it merely transfers the process from humans to an already existing computer network.

DriverReach submitted Supplemental Authority comprising *University of Florida Research Foundation, Inc. v. General Electric Co.*, 916 F.3d 1363 (Fed. Cir. 2018), which has already been addressed above, as well as the file history of the continuation application—U.S. Patent Application No. 14/046,269 ("the '269 App.")—of the '575 patent. While the systems claims set forth in the '269 App. were rejected under 35 U.S.C. § 101, Tenstreet allowed the application to go abandoned. Thus, it is unclear if Tenstreet could have overcome the rejection and the Court will not and need not speculate here on the ultimate eligibility of those claims.

For its part, Tenstreet submitted Supplemental Authority comprised of several district court cases and a Patent Trial and Appeal Board case. (ECF Nos. 36-1-5; 44-1). While these cases are not mandatory authority, the Court has considered them and found them to be distinguishable. *Ex parte Richard A. Landsman*, Appeal No. 2018-004351, at 8 (PTAB Mar. 29, 2019) (upholding the eligibility of a patent that improved the existing technology for controlling electronic messages based on communication relationships); *Magnacross LLC v. A.B.P. International, Inc.,* No 3:18-CV-02368-M, at 2 (N.D. Tex. Feb. 25, 2019) (without describing the contents of the patent, denying the motion to dismiss without prejudice to Defendant arguing, after claim construction has occurred, that the patent is not directed at patent-eligible subject

11

matter); *Teleconference Systems LLC v. Metaswitch Networks Corp.*, No. 6:18-CV-234 JDK, at 8-9 (E.D. Tex. Feb. 5, 2019) (finding a patent that claimed a videoconferencing services switch for use in an IP network to be patent-eligible, as it improved the capabilities of the existing technology); *Escort Inc. v. Uniden America Corp.*, No. 3:18-CV-0161-N, at 3 (N.D. Tex. Feb. 4, 2019) (holding patent-eligible technology that improved the functionality of radar detectors by reducing false alerts); *Express Mobile, Inc. v. Code & Theory LLC*, No. 18-CV-04679-RS, 2019 WL 477639, at *5-6 (N.D. Cal. Jan. 29, 2019) (rejecting a § 101 challenge to a patent claiming a software that created a new paradigm to build web pages, finding it improved the functionality of the computer, rather than using a computer to carry out pre-existing tasks); *Groove Digital, Inc. v. Jam City, Inc.*, No. 1:18-CV-01331-RGA, 2019 WL 351254, at *6 (D. Del. Jan. 29, 2019) (denying a motion to dismiss a patent as ineligible that claimed a system for delivering and serving advertisements to an end user on a network without prejudice to Defendant raising the § 101 issue again on summary judgment.) The patents in these cases make improvements to existing technology, concern systems claims, and/or relate to claims where it is not yet clear whether there is patent eligible subject matter, while the '575 patent merely recites a familiar process to be implemented on a generic computer.

Having found the claim is directed to an abstract idea, the Court proceeds to step two of the *Alice* inquiry.

*B. Alice Step Two*

After "scrutinizing the claim elements more microscopically," *Elec. Power*, 830 F.3d at 1354, the Court finds no sufficient inventive technology to transform the abstract idea of collecting, organizing, and storing data on a generic computer into a patent-eligible application. *See Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 79, 78). The '575 patent claim requires, generally, a computerized exchange that can (1) allow communication channels to interface with the exchange, (2) assign an attribute to each participant, (3) receive verification requests, (4) compare requests with the requirements, (5) route the requests to an employer, (6) receive verification data provided by the employer, and (7) route the received data to the requester. ('575 Patent, ECF No. 1-1 at 5:42-67; 6:1-14.) No inventive technology is needed to carry out these requirements; they can be performed on a conventional computer and network.

Tenstreet argues that the '575 patent recites an inventive concept because "conventional methods were not capable of allowing the applicant to participate in the exchange of data in real time." (Pl.'s Br., ECF No. 24 at 22.) The Court is not persuaded. The '575 patent did not invent anything new by automating a manual process onto a computer that already had the capability of exchanging data in real time. Like in *Electric Power Group*, the '575 patent does not "include any requirement for performing the claimed functions of gathering, analyzing, and displaying in real time by use of anything but entirely conventional, generic technology." *Elec. Power Grp.* 830 F.3d at 1356. Similarly, that the automated process now allows providers to

manage requests through one web-based channel, rather than through multiple channels, is not an inventive concept that makes any improvement to existing computer technology. *FairWarning*, 839 F.3d at 1097 ("[T]he mere combination of data sources . . . does not make the claims patent eligible.")

Tenstreet seems to think that because the '575 patent claim improved upon the conventional method of pre-employment verification it is necessarily a "technological improvement" and therefore patent-eligible. (Pl.'s Br., ECF No. 24 at 23-24.) Although the '575 patent may have made the employment verification process more efficient and accurate, it did not make any improvements to computer technology. "If a patent's recitation of a computer amounts to a mere instruction to implemen[t] an abstract idea on a computer, that addition cannot impart patent eligibility." *Alice*, 573 U.S. at 223 (internal citations and quotations omitted). The relevant question then, is whether the claim . . . do[es] more than simply instruct the practitioner to implement the abstract idea of [employment verification] on a generic computer." *Id*. at 225.

Looking at the claim elements separately, the functions performed by the computer are routine and conventional. *See Mayo*, 566 U.S. at 79. Using a computer to assign an attribute to and facilitate communication between participants of the network are basic computer capabilities. The same is true for the conventional functions of receiving, sending, and storing data. No software or network improvements had to be made to allow employers and job applicants to communicate and share information on a computer.

14

"Considered 'as an ordered combination,' these computer components of [Tenstreet's] methods 'ad[d] nothing . . . that is not already present when the steps and considered separately." *Alice*, 573 U.S. at 225 (quoting *Mayo*, 566 U.S. at 79). Construing the claim elements in the manner most favorable to Tenstreet, and viewing the functions as a whole, a method of facilitating various communications channels to receive, send, and store data, the claim merely recites generic computer functions that do nothing to improve existing computer technology. *See TLI*, 823 F.3d at 613.

## IV. Conclusion

Because Plaintiff failed to state a claim upon which relief can be granted, Defendant's Motion to Dismiss (ECF No. 14) is **granted**. Plaintiff's claims are dismissed on the merits with prejudice. The claims of U.S. Patent No. 8,145,575 are patent-ineligible under 35 U.S.C. §101 and therefore invalid. A final judgment will be entered separately.

**SO ORDERED.**

Date: 9/30/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Karen M. Cassidy
KNOBBE, MARTENS, OLSON & BEAR, LLP
karen.cassidy@knobbe.com

Michael K. Friedland
KNOBBE,MARTENS, OLSON &BEAR, LLP
michael.friedland@knobbe.com

Lauren Keller Katzenellenbogen
KNOBBE, MARTENS, OLSON & BEAR, LLP
lauren.katzenellenbogen@knobbe.com

Andrew M. McCoy
FAEGRE BAKER DANIELS LLP (Indianapolis)
andrew.mccoy@faegrebd.com

Louis T. Perry
FAEGRE BAKER DANIELS LLP (Indianapolis)
louis.perry@faegrebd.com

James W. Riley, Jr.
RILEY BENNETT EGLOFF LLP
jriley@rbelaw.com

Elizabeth M.C. Scheibel
FAEGRE BAKER DANIELS LLP
elizabeth.scheibel@faegrebd.com

JD Schneider
FAEGRE BAKER DANIELS LLP
jd.schneider@faegrebd.com